The People of the State of New York, Respondent, v. Henry H. Werblow, Appellant.

First Department, March 27, 1925.

Crimes — grand larceny — jurisdiction — defendant, resident of China, entered into conspiracy with his two brothers to defraud London branch of New York bank — defendant was assistant manager of Pekin branch of New York bank — two brothers resided in New York — scheme was developed by cablegrams — conspirators purchased draft in New York on London branch and one brother went to London to establish credit at London branch — defendant sent valid cable of money to brother in London, then followed two fraudulent money cables which were honored and money later taken by brothers — courts of this State have jurisdiction under Penal Law, §§ 1930, 1933 — People, under Code of Criminal Procedure, §§ 643-645, can join in commission granted defendant to examine witnesses and can examine any witnesses desired — People not limited to cross-examination of defendant's witnesses — Civil Rights Law, § 12, and Code of Criminal Procedure, § 8, not bar — evidence — specimens of typewriting for comparison properly admitted — acts of defendant's co-conspirators properly admitted.

The courts of this State have jurisdiction of the crime of grand larceny under section 1930 of the Penal Law, which provides for the punishment of a person who commits a crime within the State, in whole or in part, and under section 1933 of the Penal Law, which provides that a person who commits an act without this State, which affects persons or property within the State and which, if committed in this State, would be a crime, is punishable as if the act were committed within the State, where it appears that the defendant, a resident of Pekin, China, an assistant manager of a branch of a New York bank, entered into a conspiracy with his two brothers, who were residents of this State, to defraud a London branch of a New York bank, with which the Pekin branch, of which the defendant was assistant manager, conducted business; that the conspiracy was developed by a series of cablegrams from New York to London and China, and from China to London and New York; that for the purpose of carrying out the plan, the defendant, and one of his brothers residing in New York, purchased in New York city a draft on the London branch in favor of the third brother, and also purchased steamship tickets for said brother to make the trip to London; that the third brother went to London and deposited the draft to his credit in the London branch, and a

few days later the defendant sent a valid money cable from his bank to the London branch to the credit of the third brother, and this money was deposited in the London branch; that the third brother represented to the London branch that he expected large funds from China for bridge construction, and immediately thereafter the defendant sent two fraudulent money cables to the London branch to the credit of the third brother, which were honored by the London branch, the money placed to the credit of the third brother, who then withdrew the money which was finally divided among the brothers.

The conspiracy had its inception in New York, the first overt act was committed in New York, and while the money was actually secured in London, the crime did affect the property of the New York bank which maintained the London branch, within the meaning of section 1933 of the Penal Law.

The People had the right, under sections 643–645 of the Code of Criminal Procedure, to join in a commission granted to the defendant to examine witnesses in China, and to examine their own witnesses in support of the indictment; the People are not limited where they join in a commission issued in favor of the defendant to cross-examination of witnesses produced by the defendant.

Section 12 of the Civil Rights Law and section 8 of the Code of Criminal Procedure, which provide that in all criminal prosecutions the accused shall have the right to be confronted by the witnesses against him, if they apply to this situation, are limited and qualified by section 643 of the Code of Criminal Procedure, which grants the People the right to examine their own witnesses where they join in a commission granted on the application of the defendant.

Specimens of typewriting, taken from the machine used by the defendant for the purpose of comparison with exhibits, placed in evidence, were properly admitted.

Likewise, it was proper to admit evidence concerning the acts of defendant's co-conspirators.

APPEAL by the defendant, Henry H. Werblow, from a judgment of the Court of General Sessions of the Peace held in and for the county of New York, rendered on the 1st day of February, 1924, convicting him of the crime of grand larceny, first degree, and sentencing him to State's Prison for a term of not less than five nor more than ten years.

*Battle, Vandiver, Levy & Van Tine* [*Isaac H. Levy* of counsel; *George Gordon Battle* and *Joseph Quittner* with him on the brief], for the appellant.

*Joab H. Banton, District Attorney* [*Felix C. Benvenga, Assistant District Attorney*, of counsel; *Hugo Wintner, Assistant District Attorney*, with him on the brief], for the respondent.

MERRELL, J.:

The defendant Henry H. Werblow was jointly indicted with two of his brothers, Robert M. Werblow, Jr., and Isaac Werblow, for the crime of grand larceny in the first degree in violation of sections 1290 and 1294 of the Penal Law. The defendant Isaac Werblow has not been apprehended, and is still at large. The defendants Henry H. Werblow and Robert M. Werblow, Jr., demanded separate trials and each has been convicted under the

indictment.   This appeal is by Henry from the judgment of the
Court of General Sessions of New York County convicting him of
the crime charged.

There were four of the Werblow brothers, the fourth brother
being James, who lived with Robert and Isaac in Brooklyn, and
who was employed by the banking firm of A. B. Leach & Co.
in New York.   James was not indicted.   The defendant Henry H.
Werblow, at the time of the commission of the act constituting
the crime for which he was indicted and convicted, resided at
Pekin, China, where he was assistant manager of the Pekin branch
of the Asia Banking Corporation.   The Asia Banking Corporation
was a New York corporation having branch offices at Hankow
and Pekin.   Prior to his going to Pekin the defendant, appellant,
was employed in the Hankow branch of the Asia Banking Cor-
poration.   Defendant was in Hankow from April, 1920, to Septem-
ber, 1920, and in Pekin from September, 1920, to September, 1922.
The appellant's codefendant Robert M. Werblow, Jr., resided in
Brooklyn and was employed in the Chase National Bank in
New York.   The other brother, Isaac Werblow, who was also known
by the aliases of Elliott Werblow and Max Elliott, lived with his
brother Robert in Brooklyn.   The charge against the defendant
in the indictment was the larceny of upwards of $100,000 from
the Guaranty Trust Company, a New York corporation, by means
of false representations whereby the brother Isaac, known as Max
Elliott, was enabled, through the aid and procurement of the defend-
ant and the brother Robert, to obtain certain moneys from the said
Guaranty Trust Company of New York, through its London branch,
and the agents and servants of said New York Guaranty Trust Com-
pany, by means of certain cables purporting to have been sent in the
name of the Asia Banking Corporation, Hankow branch, directing
the payment by the London branch of the Guaranty Trust Com-
pany to said Max Elliott of the said moneys.   The Guaranty Trust
Company of New York is a well-known banking institution incor-
porated under the laws of this State, having its principal business
office in the city of New York.   During all the times referred to in
the indictment it maintained at the city of London, Eng., its
London branch.   The London branch had no separate corporate
existence and was opened under the authorization of the New
York State Superintendent of Banks to transact the business of
the Guaranty Trust Company of New York in London.   The
London branch made monthly reports of its business to the board
of directors of the New York Guaranty Trust Company in accord-
ance with the banking laws.   The chief assets of the Guaranty
Trust Company were always in New York and the assets and liabil-

ities of the London branch were carried, credited and charged as the assets and liabilities of the Guaranty Trust Company of New York. Business was transacted between the Guaranty Trust Company of New York, its London branch, and the two branches of the Asia Banking Corporation in China by means of secret codes and cipher cables. Cablegrams transmitting money between the cities of New York and London and the Chinese cities were by means of such secret code, which was devised by the Guaranty Trust Company of New York and was in general use among its correspondents, including the Chinese banking institution. Beside the regular secret code in use between these banking institutions, the correspondent banks of the Guaranty Trust Company employed also a common secret cipher key in conjunction with the code which was used to authenticate the cables transmitting money. The secret code and cipher key were known to only a limited number of the officers and employees of the Guaranty Trust Company and of the Asia Banking Corporation. They were in use in the Hankow and Pekin branches of the Asia Banking Corporation and were known to the defendant Henry Werblow.

The evidence shows that sometime in June, 1922, a conspiracy or confederation was formed between the three brothers Werblow. At that time a series of cablegrams partly in code, partly in the Yiddish language, and partly in mixture of both, were exchanged between Henry Werblow, the defendant, in Pekin and Robert Werblow in New York, and later between Robert in New York and Isaac in London. These cablegrams indicate the preparation and the laying of plans for the consummation of the crime for which the defendant was later indicted. The cablegrams disclose the scheme which was formed that Isaac Werblow was to leave New York and go to London armed with a draft for £100 payable to " Max Elliott " drawn by the Guaranty Trust Company of New York upon its London branch. With such draft Isaac, under the name of Max Elliott, was to open an account in the London branch of the Guaranty Trust Company. It was then planned that Henry, the defendant here, under the alias of " Chester James," was to transmit a *bona fide* cable through the Hankow Asia Banking Corporation, with which defendant was connected, for £300, also payable to Max Elliott by the London branch of the Guaranty Trust Company; and Isaac, under the alias of Max Elliott, was to inform the officials of said London branch that besides said £300 he was expecting further large remittances from the same source in Hankow in connection with a supposititious bridge contract with the Chinese government. The plans of the three brothers further contemplated that having thus established credit in the London

branch of the Guaranty Trust Company, two fictitious cables were to be sent by the defendant from the Asia Banking Corporation and purporting to be sent by the Hankow Asia Banking Corporation, directing the Guaranty Trust Company in London to pay to said Elliott respectively, £17,430 and £14,200 on account of such pretended government contract. It was further planned by the conspiracy that Isaac Werblow under the name of Max Elliott was then to check out said moneys from the London Guaranty Trust Company and transmit them to the Pekin Asia Banking Corporation for the account and to the credit of the fictitious Chester James in Pekin. It was then planned that Henry, on receipt of such moneys by the Pekin Asia Banking Corporation, was to open an account on the books of said banking corporation in the name of Chester James, or in the name of a fictitious firm of Hilliard & James, and credit such account therewith. At the time Henry Werblow, the defendant, was assistant manager of the Pekin Asia Banking Corporation, and was, therefore, in a position to control the transaction and the moneys being lodged with said banking corporation. The defendant, acting either as Chester James or Hilliard & James, could, whenever he wished, withdraw such funds and dispose of them as he might see fit.

The plan thus formed by the brothers was carried out. On June 15, 1922, the defendant cabled his brother Robert in New York from Pekin, China, as follows:

" Referring to your last telegram have simplified plan to extent of eliminating all characters except Elyot. James presence here not necessary. No outsiders participate. Advise Elyot that after arrival at his destination he is to communicate with me as follows:

Chester James, Bankasia, Pekin.

Send all communications always to Pekin, never to any other port at any time, although he may have received information indicating my presence other ports. HOZKE."

Hozke was a name assumed by the defendant in his cipher cablegrams. Four days later, on June nineteenth, Robert cabled the defendant in reply:

" Received your two telegrams, writing for funds. Will wire date of sailing. In the future use Robwerblo."

On June twentieth Henry cabled Robert:

" For immediate funds if necessary sell Anglo stock. Later will remit Eliot at destination."

On June twenty-sixth Isaac Werblow, giving his address 763 Park Place, Brooklyn, applied to the Passport Control Office,

New York, for a *visé* to visit the United Kingdom. It was not granted until July fifth. On June twenty-seventh Henry cabled Robert:

" Hasten as much as possible."

On June thirtieth Robert cabled defendant:

" Elyot waiting for *visé*. In any case one of us will leave not later than July 8th."

On June twenty-seventh the brothers Robert and Isaac Werblow appeared at the office of the Guaranty Trust Company in New York. Isaac introduced himself to a Mr. Seaman, the official in charge of the company's foreign exchange, as Max Elliott, and signed an application for a draft for £100, paying $441.63. The draft was issued in the name of Max Elliott and drawn on the London Guaranty Trust Company. At that time Robert and Henry had a joint account in the New York Trust Company, New York city. The account in said last-mentioned company shows the charging of a check against said account for $450 on June 27, 1922. Seaman afterwards recognized a photograph of the defendant Isaac as the person who bought the £100 draft on June twenty-seventh. On July second Henry cabled his brother Robert as follows:

" Owing to possible recognition of Elyot use your judgment. Great caution in conjunction with *visé*. Will sign Xxazke, Mitzke, Itzke accordingly."

On July fifth Isaac's application for a *visé* to visit England was granted by the Passport Control Office in New York and on the same day the White Star Line sold a steamship ticket in the name of Icakas Verbelovas for one first-class passage on the steamship *Majestic* sailing July eighth. The original berthing list shows that the steamship company issued the ticket first to Robert Werblow, and that his name was then stricken out and the name Icakas Verbelovas substituted. The price of the ticket was $285 and the joint account of the defendant and Robert Werblow in the New York Trust Company shows the cashing of a check for that amount on July 6, 1922. On July sixth Robert Werblow made application for a *visé* to visit England and on the same day cabled his brother, the defendant, as follows:

" Itzke due to sail 8th July. Use double ' l ' double ' t ' in the name Elliott. Telegraph to him of every remittance. It is very important for the purpose of referring and also convincing in the bank. Use New York Trust Company as well as Chase for your remittances. MITZKE."

On July eighth Robert again cabled the defendant:

" Itzke sailed today, Mixke home."

On July tenth defendant, by the name of " Xazke," cabled his brother Robert in New York as follows:

" Take steps to collect dividends on Prairie Oil. Believe further communication regarding large proposition must be discontinued. Cables can be traced·Itzke Mitzke. Must adopt safer communication. I am writing fully. Be cautious. XAZKE."

On July 14, 1922, the defendant, Henry Werblow, cabled Max Elliott at London as follows:

" Telegraphing you from Hankow as follows: On June 17, £300 June 20, £17,430, June 22, £14,200. All of the remittances on account Hankow Government. You have their authority act on behalf of Government. Advise Bank interested accordingly. Also funds are to be used for constructing railroad bridge amounting to £120,000 and state that you may perhaps need the bank's financial help. Give above information to the bank immediately upon arrival. State further in case bank give assistance financing your clients will give substantial securities. When you open your account Guaranty Trust interview with executive official and promise to do large business in the future. Demand large interest on your deposit. Act bravely and independent. Transfer funds to me as soon as possible. Act accordingly to best possible judgment. Telegraph me Chester James, Bankasia, Pekin. Destroy by fire all of the [sic] upon their receipt. Love. XOZKE."

And two days later he cabled his brother Robert as follows:

" I have Elyot telegraphed to him £300 July 22, £17,000 July 20, £14,000 on July 22nd Hozke. Will he be in time for receiving. I cannot wait any longer. Reply immediately. Urgent."

On the same day, July sixteenth, Robert Werblow cabled his brother Isaac under the name of Max Elliott in London as follows:

" Xazke informs me that he has sent over to you £300 on July 17th, £17,000 on the 20th and 14 on the 22nd. MIXKE."

The evidence further showed that on or about July seventeenth a person introduced himself in London to the manager of the London branch of the Guaranty Trust Company as Max Elliott and presented the £100 draft theretofore drawn by the Guaranty Trust Company. His signature was recorded and Max Elliott was identified on the trial as the defendant Isaac Werblow and the person who presented such draft. The £100 were placed to the credit of Max Elliott by the London branch of the Guaranty Trust Company, together with £10 which he added thereto. Subsequently the three cables were received from the Asia Banking Corporation at Hankow, one being the genuine one for £300, and the two others, for £17,430 and £14,200, respectively, being for-

geries. These amounts, however, were added to the credit of Max Elliott in the London Guaranty Trust Company, and he was later paid those sums by said company. It thus appears that the conspiracy was carried out through the three cables from Hankow to the London branch of the Guaranty Trust Company. The first cable, representing a *bona fide* transaction of £300, was actually paid over the counter of the Hankow Asia Banking Corporation. The other two cables were fraudulent and were forged in the name of the Asia Banking Corporation. The first or genuine cable for £300 was dated July 18, 1922, and was addressed to the Guaranty Trust Company of London and directed said company to pay to Max Elliott £300, account of Chester James. The second, or first of the forged cablegrams, was dated July 20, 1922, and was as follows:

"Advise pay £17,430 to Max Elliott for a/c of Provincial Government. Governor promises to pay additional this week. Balance due you 3 months. A. B. C."

The third cablegram was dated July 22, 1922, was sent from Hankow, China, and addressed to the Guaranty Trust Company, London, as follows:

"Pay £14,200 to Max Elliott Provincial Government. A. B. C. Hankow."

All of these cablegrams were in the Guaranty Trust Company's private code and contained the correct cipher key. At about the time the first or £300 cable was sent on July eighteenth, it was shown that a Chinese of the servant class appeared at the counter of the Hankow Asia Banking Corporation and delivered Chinese money equivalent to £300, together with a typewritten letter dated July 17, 1922, addressed to the manager of the Hankow Asia Banking Corporation and signed "Chester James, Legal Advisor to Civil Governor." The letter was as follows:

"Please remit, at my risk, by cable at your best possible rate, £300 (Pounds Sterling Three Hundred — only) to 'Max Elliott, care of American Express Co., London, account of Chester James.' As I have not arranged for code messages to Mr. Elliott, and wishing to save cable expenses, I would appreciate it very much if you will, kindly, while making this remittance, in the same cable, at my expense instruct your correspondent to advise Mr. Elliott as follows:

"'Wuchang Provincial Government accepts our offer on bridge and agree to remit 30% this week.'

"I am sending with the bearer, my servant, funds to cover this remittance and all cable charges.

"Please give him your usual confirmation statement and receipts."

The letter was typewritten on a machine proven at the trial to have been used by the defendant in the office of the Pekin Asia Banking Corporation. The second £17,430 cable was not signed by the Hankow Asia Banking Corporation nor did it have any knowledge thereof. The original cable as filed at the Hankow office of the Chinese Telegraph Administration was produced in evidence and thereon were certain words proven to be in the handwriting of the defendant. The original cable itself was typewritten on the machine used by the defendant in the Pekin Asia Banking Corporation office, and was printed upon the same typewriter as that upon which the letter signed " Chester James, Legal Advisor to Civil Governor " was written. The third cable for £14,200 was not signed by the Hankow Asia Banking Corporation, nor had it any knowledge thereof. The original cable was produced from the files of the Chinese telegraph office in Hankow, and the cable, like its predecessor, was written on the same typewriter in the Pekin office of the Asia Banking Corporation, and bore thereon evidences of the handwriting of the defendant. All three cables were received by the London Guaranty Trust Company and honored, with the result that the account of Max Elliott in said company was credited with the total sum of £31,930. Upon the trial cablegrams passing between the defendant and his brothers were proven in evidence clearly relating to the fraudulent transaction which had been consummated. On July twenty-fifth, almost immediately after the account of Max Elliott had been credited as aforesaid, he drew a check on the London Guaranty Trust Company for £23,350 payable to the Hong Kong and Shanghai Bank, and requested that that amount be forwarded by cable to the Pekin Asia Banking Corporation for the credit of Chester James. The Hong Kong bank took this check to the London Guaranty Trust Company and received a cashier's check for that sum. On the day following Isaac Werblow, using the name of Max Elliott, drew a check on the London Guaranty Trust Company for £5,450 payable to the Chartered Bank of India, and requested that such amount be forwarded by cable to the Pekin Asia Banking Corporation to be credited to the account of the said Chester James, and the Chartered Bank received from the London Guaranty Trust Company a cashier's check for that amount. Soon thereafter there was paid over to the Pekin Asia Banking Corporation the two sums mentioned in said checks. The defendant was in charge of the Pekin Asia Banking Corporation at the time said moneys were received. He at once opened an account in said banking corporation in the name of Hilliard & James, and the moneys aforesaid were put to the credit of such supposed firm. None of the clerks

or *attachés* of the Pekin bank ever saw Chester James or anybody composing the firm of Hilliard & James. The defendant took entire charge of the opening of the account on the ledger, the obtaining of signature cards, and attended to the entire transaction. Later on the moneys were checked out by checks purporting to be in the name of Hilliard & James, and finally were transmitted to New York city through means of Japanese drafts which the defendant had obtained and mailed to his brother Robert Werblow. They were received by Robert on or about August 28, 1922. On August thirtieth he sold one to A. B. Leach & Co. of New York, bankers, through his younger brother, James, who was there employed as a clerk. A check for that amount was given to James by Leach & Co. James indorsed it to Robert and Robert deposited it in his and Henry's joint account in the New York Trust Company. It thus appears that the moneys which had been feloniously taken from the Guaranty Trust Company finally reached the defendant and his brother Robert. The evidence showed that soon thereafter the suspicions of the Guaranty Trust Company were aroused and an investigation started and Henry was called to account. At about that time, September 5, 1922, the defendant cabled his brother Robert Werblow at New York as follows:

" Itzke shall hide himself. They are looking for him. BAD."

On September sixteenth the defendant cabled his brother Robert as follows:

" I have sent cable from N. Y. They say that you have 96,000 Japanese money. You have made a great mistake. It is known that you have given a check to Itzke to buy £100. Now you must say that you know nothing about it. You must say that Itzke requested your check gave you cash. You shall say that I sent you Japanese money to keep for a Chinese friend. His name is Chin Pan Fu. You should hide all your money. It is not very good. You and I are being shadowed. You will be arrested. You should prepare accordingly. HOZKE."

Many more cablegrams passed between the brothers Werblow, but those hereinbefore quoted conclusively show the birth of the conspiracy and its consummation. The record before us establishes beyond any question the commission of the crime of grand larceny and defendant's complicity therein. The evidence points irresistibly to the guilt of the defendant, appellant.

Two main points are urged by the appellant why the judgment of conviction should be reversed. The first is that the New York courts were without jurisdiction to try the defendant upon the offense charged. As to this point I think the jurisdiction of the

New York court was complete. While it is true that the defendant, at the time the transactions actually occurred, was a resident of and in China, the forgeries were committed as a part of a scheme to defraud the Guaranty Trust Company of New York. They were carried on by the three brothers, Henry, Robert and Isaac. While Henry, the defendant, was in China, Robert was in New York, and Isaac, or Max Elliott, as he was known, was in London. It was necessary for the success of their plan that the brothers should occupy the respective positions they did. The co-operation of the three brothers was necessary to the successful consummation of the crime. The fraudulent cablegrams containing and constituting the false representations were fabricated in China, were transmitted from there to London, and the money obtained in London, but nevertheless the conspiracy had its inception in New York. Cablegrams constituting essential steps in the scheme were sent from New York to China and London, and were received in New York from China and from London. The first overt act of the conspirators in carrying out their scheme was the procuring of the £100 draft from the Guaranty Trust Company of New York. This was in furtherance of the scheme and under the direction of the defendant. The draft was purchased of the Guaranty Trust Company of New York payable to the order of the brother Isaac under the name of Max Elliott in London. The brother Isaac at once procured a steamship ticket which was paid for by the defendant and the brother Robert from their joint account in the New York Trust Company. Isaac went to London and established his credit in the London branch of the Guaranty Trust Company under the name of Max Elliott. Then followed the successive steps in the conspiracy whereby from Hankow the defendant cabled £300 sterling to fortify the credit of Max Elliott in the London branch. Then followed the other two fraudulent telegrams for £17,430 and £14,200 which were the false instruments whereby the money was taken from the Guaranty Trust Company. So it appears that the inception at least of the conspiracy occurred in New York. Under section 1930 of the Penal Law it is provided that a person is liable to punishment within this State who commits within the State any crime in whole or in part. Section 1933 of the Penal Law provides that "A person who commits an act without this State which affects persons or property within this State, or the public health, morals, or decency of this State, and which, if committed within this State, would be a crime, is punishable as if the act were committed within this State." There can be no question but what the proofs show the commission of this crime in part in the State of New York, and that even the acts

committed out of the State affected the person and property within the State of the Guaranty Trust Company of New York, which was the victim of the conspiracy of the defendant and his brothers. (*People* v. *Zayas,* 217 N. Y. 78; *People* v. *Arnstein,* 211 id. 585; *People* v. *Licenziata,* 199 App. Div. 106.)

The defendant also asks reversal upon the ground that the People were improperly permitted to join in a commission to examine witnesses in China in support of the indictment. The defendant applied for an order that certain witnesses be examined in the case pursuant to the provisions of sections 636 *et seq.* of the Code of Criminal Procedure. This order was granted and it was therein provided that the People be permitted to join in the commission and examine witnesses in support of the indictment under sections 643–645 of the Code of Criminal Procedure. The People availed themselves of this privilege and served upon counsel for the defendant interrogatories proposed to be put to such witnesses. The defendant had the opportunity of proposing cross-interrogatories and of cross-examining the People's said witnesses, but failed to do so. The defendant in this respect relies on the statutory provision of the Civil Rights Law (§ 12) and of the Code of Criminal Procedure (§ 8) which provides that in all criminal prosecutions the accused has a right to be confronted with the witnesses against him. This provision of the Civil Rights Law and of the Code of Criminal Procedure is statutory and is subject to change or qualification by the Legislature. By the enactment of section 643 of the Code of Criminal Procedure it was provided that where a commission should issue to take testimony in behalf of the defendant, the order must provide " that the People be permitted to join in the commission, *and to examine witnesses in support of the indictment.*" The defendant attempts to construe such statutory provision as merely permitting the cross-examination of such witnesses as the defendant sought to examine by commission. The statute certainly is not susceptible of such narrow interpretation, and when it said that the People were permitted to join in the commission and to examine witnesses the Legislature must have meant that the People were given the right to examine witnesses generally and not merely to cross-examine the defendant's witnesses. All that section 12 of the Civil Rights Law and section 8 of the Code of Criminal Procedure really provide is that an opportunity shall be given the defendant to cross-examine witnesses testifying against him. That is the only reason why he is entitled to be confronted by such witnesses. As is said by Wigmore (3 Wigm. Ev. [2d ed.] § 1365): " The right of confrontation is the right to the opportunity of cross-examination. * * * So far as confrontation is an indispensable

element of the Hearsay rule, it is merely another name for the opportunity of cross-examination."

I have examined the alleged errors in the court's instruction to the jury and I do not find that ground for reversal is presented thereby.

It is also claimed by the appellant that specimens of typewriting were improperly received in evidence for the purpose of comparison with disputed writing. The law is well settled that such specimens of typewriting are properly received in evidence for the purpose of comparison. (*People* v. *Storrs*, 207 N. Y. 147, 152; *People* v. *Risley*, 214 id. 75.)

It is also urged in appellant's brief but not argued by counsel before us that the acts of defendant's confederates or conspirators were improperly permitted to be proven. The law is reasonably well settled that where the crime charged is alleged to have been committed by persons acting in concert the acts and declarations of those who were thus acting are admissible to prove the conspiracy or concert of action and are binding upon all who by their own acts or conduct are shown to have been parties to the common design. This is true whether the trial be for conspiracy or for the commission of a crime for which the conspiracy was formed. (*People* v. *Micelli*, 156 App. Div. 756; affd., 216 N. Y. 727; *People* v. *McKane*, 143 id. 455; *People* v. *Peckens*, 153 id. 576.)

The judgment of conviction should be affirmed.

CLARKE, P. J., DOWLING, McAVOY and BURR, JJ., concur.

Judgment affirmed.