UNITED STATES, Appellee

v

BISHOP P. PARRISH, Jr., Colonel U. S. Air Force, Appellant

7 USCMA 337, 22 CMR 127

338

No. 8181

Decided August 31, 1956

*Thomas H. King,* Esq., argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Stanley S. Butt* and *Major Edmund B. Sigman.*

*Major Fred C. Vowell* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Roger H. Miller.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

I

The accused stands convicted of certain offenses growing out of irregularities allegedly committed by him while he was Commander of the Far East Air Force Base, 5th Air Force, APO 927. The offenses can be catalogued generally as misappropriation of Government property, improper dealings in a money transaction with a finance officer, and false official oaths. The facts and circumstances concerning the individual crimes are not important; however, in order to present the issues in

**339**

an understandable manner, we believe it advisable to state generally the facts concerning the offense and conviction, about which the accused complains most ·bitterly.

On or about March 1, 1954, the accused discussed with one Captain Jerry M. Hartz, his finance officer, a proposition which involved the temporary loan of Government money without the making of the usual record, and without the knowledge of other members of the command. The Captain was reluctant to engage in any improper transaction, and he discussed accused's request with his immediate superior. The latter advised against the mishandling of Government funds or credit, but the accused continued to importune his subordinate to assist him, for he urgently needed the sum of $2,500.00 to meet his commitment to purchase a new automobile. The Captain finally yielded to the demands of the accused, and on March 1, 1954, a check in the sum of $2,500.00, drawn on the United States Treasury, was issued to the order of accused. The transaction came to light, and an investigation was commenced. Some thirty days thereafter, on March 30, 1954, the accused gave Captain Hartz $1,900.00, part of which was in military payment certificates and the balance in Japanese yen. In order to make up the shortage, Captain Hartz contributed $300.00 in cash and his personal check for $300.00. As security for repayment of this loan, the accused executed a promissory note, dated March 31, 1954. However, that date did not jibe with other written evidence, and a note dated March 1, 1954, was subsequently given to the Captain.

The evidence for the defense corroborated part of the facts produced by the Government, but disputed the illegal parts of the transaction. The accused denied that the Treasury check in the sum of $2,500.00 represented a loan of Government funds to himself. He testified that he informed Captain Hartz that he owed $2,500.00 to his brother and intended to send some $1,700.00 or $1,800.00 on account; that Hartz volunteered the information that he had some extra money which was lying idle; that he would personally loan the accused $600.00 to enable a remittance to be sent for the full $2,500.00; that at the time he received the check accused paid Hartz $1,900.00 in military payment certificates; and that on or about March 1, 1954, he executed a promissory note to Hartz for the $600.00 which had been advanced.

The facts we have related, together with the additional ones found in the record, show in essence no dispute about the fact that the accused was issued a check in the sum of $2,500.00 on March 1, 1954, and that on or about that date or sometime thereafter he contributed $1,900.00 and Hartz contributed the remaining $600.00. The dispute thus narrows to two contentions. The Government's theory is and was that the accused obtained a loan of Government money for approximately thirty days, and did not repay it until an investigation was reported to have begun, when arrangements were made to cover up the nature and extent of the transactions. On the contrary, the accused asserted that the dealings were bona fide, in that he borrowed $600.00 from Hartz, added it to the $1,900.00 he possessed, and turned the full sum over to the finance officer in exchange for the Treasury check.

With those facts and theories as a background, we pass on to discuss the evidence bearing on the important issues we included in our grant of review. They will be stated as they are considered, but, in general, they permitted defense counsel to make a frontal attack on our previous rulings that depositions may be used by the prosecution in military courts. On July 10, 1954, the accused was relieved of his command, pending investigation of certain purported irregularities. Captain Hartz was the base finance officer and he was relieved on the same date for substantially the same reason. On the day after his relief from his assignment, Hartz was admitted to a hospital for observation and treatment. From that date until about August 28, 1954, he was treated by Captain Rosen, a medical officer, who was called by the defense as an expert witness. We relate his testimony first as he fixes Hartz' mental condition immediately after the latter's

collapse. He testified substantially as follows: That during his period of observation, which was from July 11, 1954, to August 20, 1954, Captain Hartz was psychotic; that the patient's mental condition amounted to a schizophrenic reaction, latent type, marked by paranoid delusions, relating to matters for which accused was being investigated; that the psychotic period was of short duration and Captain Hartz was not mentally ill for a long period of time; that the patient's personality, which made him vulnerable to his mental breakdown, had been present all of his life; that his delusions, however, seemed to have been of recent origin, probably starting around the time he was admitted to the hospital; that in his opinion the Captain's incompetence became apparent on July 6, 1954; that he would not express an opinion as to the Captain's competency during the months of February and March 1955; that he possessed no information which would cause him to doubt the patient's mental competency during that period; that he found no physical damage to the brain and the Captain's memory seemed to be intact; that if Hartz was in a state of remission, Rosen would consider him a reliable witness, for his testimony would probably not be distorted by delusions; that patients recover from certain types of schizophrenia; that they are not considered cured, but in a state of remission, as they may have a relapse; that when in a state of remission, persons suffering from schizophrenia would be free from delusions; that he could not say whether Captain Hartz was in remission on December 3, 1954, but if he was he would be mentally capable of understanding the nature of an oath and the mental obligation of telling the truth; that during a period of remission the Captain would be capable of giving a true account of facts observed prior to the time he became incompetent, free of distortion; and that it is possible for one during a period of remission to believe that former delusions really happened, but Captain Hartz was not in that category.

The testimony of the other two medical witnesses was introduced by the prosecution. Their evidence was placed before the court-martial by answers to written interrogations recorded on February 16, 1955. The evidence of Dr. Grasberger will be first related. He was Chief of Acute Intensive Treatment Service at Perry Point Veterans' Hospital. He had specialized in psychiatry since 1946. In answer to the submitted interrogatories and cross-interrogatories, he testified that Captain Hartz came under his supervision November 26, 1954. The Captain's mental derangement was diagnosed as schizophrenia reaction, paranoid type. He was requested to explain his answer in lay language, and stated: "This patient had a mental illness in Service which was characterized by hearing imaginary voices, depressive mood and bizarre ideas regarding his body. This condition was treated with electroshock in Service and at the time of admission to this hospital he had improved sufficiently so that he no longer could be considered psychotic." He did not examine Captain Hartz on December 3, 1954, the day the Captain's deposition was taken, but he did examine him on November 29 and December 4 of the same year. He was unable to find any evidence that the Captain was then psychotic, and he concluded the patient was in a remission from his psychosis. While the patient had recovered from his insanity, the doctor could not predict when he might revert back to mental incompetency. He found no evidence of psychosis during the period November 26, 1954, until December 4, 1954, but by December 22, 1954, the patient gave evidence of passing back to a state of insanity and on December 28, 1954, he was considered as insane. In his judgment, the Captain, at the time Hartz answered certain interrogatories, was mentally capable of understanding the moral obligation of telling the truth while under oath, of remembering facts observed by him during the preceding year, and of giving a true and correct account of facts observed during that period. He explained the basis of his reasoning by stating: "Because he did not give any evidence of psychosis or memory impairment on the dates I examined him. Also because he was alert and answered questions relevantly and

coherently on the dates I examined him." He accepted the evaluation of Captain Rosen for the earlier period, but that evaluation did not agree with his findings made in December. He explained the difference in the diagnosis by stating that the patient had improved between the dates he was examined in Tokyo and the time when he was examined at Perry Point.

Dr. Margaret Wendell testified by deposition to substantially the same information as that furnished by Dr. Grasberger. She treated Captain Hartz from November 26, 1954, to January 24, 1955. Her diagnosis was schizophrenic reaction, paranoid type, which she explained in the following terms: "The patient suffers from unpleasant ideas which are not in accord with reality." She examined Captain Hartz on the same day his deposition was taken and concluded that he was mentally clear, possessed good power of concentration, had a good memory, and was not troubled by delusions. According to her diagnosis, the Captain was in good contact with reality up to about December 22, 1954, when he developed somatic delusions, intense guilt feelings, and severe anxiety. On the latter date, he was considered to have relapsed from his period of remission. So far as she was concerned, on December 3, 1954, the Captain was mentally capable of understanding the responsibility and moral obligation of telling the truth when under oath and he was mentally capable of remembering facts observed by him during the next preceding year. She had considered the findings of Captain Rosen, which she did not dispute, but stated that they did not agree with those made by her on December 3, 1954. She would not venture an opinion as to the nature of his delusions at the onset of his illness, but when he relapsed on December 22, 1954, she concluded they were somatic rather than persecutory.

## II

The issues we granted on review will be discussed in the order in which they appear in the brief filed ▪ by appellate defense counsel. The first argument presented by the defense is that accused was denied the right of confrontation by virtue of the fact that the Government was permitted to use depositions to prove some of the essential facts of the alleged offenses. To support that contention counsel for the accused make a determined bid to have the Court overrule the Code, the Manual, and its decision in United States v Sutton, 3 USCMA 220, 11 CMR 220. The views of the three Judges sitting at the time the Sutton decision was rendered are fully stated in that opinion. Judge Ferguson has chosen to follow the principle announced by the majority and no good purpose would be served by repeating what was there said. Accordingly, this issue is resolved against the accused without further comment.

## III

Defense counsel vigorously assert that even accepting the rule of the Sutton case, the accused was nevertheless prejudiced because Captain Hartz' testimony was produced by deposition and the law officer was not afforded an opportunity to observe him personally to determine his competency to testify as a witness. This is the gist of the second issue, but we first note that accused makes some attack on the regularity of the appointment of counsel to represent the accused at the time when interrogatories and cross-interrogatories were prepared. Our search of the record shows no irregularities or improprieties. Charges were preferred against the accused on October 8, 1954. Three days later an investigating officer was appointed and, on October 30, 1954, he completed his hearings and recommended trial by general court-martial. In his report he stated:

"Mr. Franklin E. M. Warren. Esq, member of the bar of the State of Oklahoma was presented by the accused as chief counsel and was present at each session. Major Redman, individual military counsel, was specifically excused by the accused at several sessions. Major Goldschlager was not appointed until 22 October 1954 as the accused did not request that the convening authority appoint counsel until that date. He was pres-

ent at each session subsequent to his appointment."

Subsequently, additional charges were preferred and investigated, and the order referring the case for trial to a general court-martial was signed on January 4, 1955. On November 3, 1954, the convening authority ordered the taking of Captain Hartz' deposition. On December 30, 1954, orders were issued for the taking of the depositions of nine other witnesses including the two psychiatrists who testified for the Government. In the order directing the taking of depositions Major James M. Heidelberg was designated to represent the prosecution and Major Carl Goldschlager was named to represent the accused. There is found in the depositions of Doctors Grasberger and Wendell the following comment:

"(The direct interrogatories in the foregoing deposition were prepared by Major James M. Heidelberg who is certified to perform the duties of counsel and law officer before General Courts-Martial in accordance with Articles 26a and 27b. The cross-interrogatories in the foregoing deposition were prepared by Major Carl Goldschlager who is certified to perform the duties of counsel and law officer before General Courts-Martial in accordance with Articles 26a and 27b; Captain Albert L. Dart who is certified to perform the duties of counsel before General Courts-Martial in accordance with Article 27b; and Mr. Franklin E. N. Warren, individual counsel, who is a member of the Bar of the Supreme Court of the United States, the Bar of the State of Oklahoma, the Bar of the State of Colorado, and who is licensed to practice before the Supreme Court of Japan.)"

The thrust of appellant's attack is that the counsel who prepared the interrogatories were not sworn. We find no such requirement in military law. Counsel who appear during the actual trial of the case are sworn, but no provision in the Code or the Manual makes it incumbent upon counsel appearing in pretrial proceedings to take an oath. Article 49 of the Code, 50 USC § 624, provides:

"(a) At any time after charges have been signed as provided in article 30, any party may take oral or written depositions unless an authority competent to convene a court-martial for the trial of such charges forbids it for good cause. If a deposition is to be taken before charges are referred for trial, such an authority may designate officers to represent the prosecution and the defense and may authorize such officers to take the deposition of any witness.

"(b) The party at whose instance a deposition is to be taken shall give to every other party reasonable written notice of the time and place for taking the deposition."

Here the officers representing the parties were designated by the convening authority. Sufficient time was allowed them to prepare their questions and the deposition was properly executed. One of the counsel who appeared was civilian counsel of accused's own choosing. Military counsel had been certified by The Judge Advocate General of the Service as qualified to represent an accused before a general court-martial, and that certification is sufficient to permit them to appear at the taking of depositions. Accused does not challenge the qualifications of those who represented him. He does not suggest that they did not perform their duties with fidelity and trust, and he points only to their lack of having taken an oath before they prepared the written interrogatories. Hence, if there was any irregularity, it had to be the failure to require an oath.

In ordinary civilian criminal trials counsel are not sworn, but the Code does impose on military courts the duty to take the oath of court members and officials. Article 42 of the Code, 50 USC § 617, is as follows:

"(a) The law officer, all interpreters, and, in general and special courts-martial, the members, the trial counsel, assistant trial counsel, defense counsel, assistant defense counsel, and the reporter shall take an oath or affirmation in the presence of the ac-

343

cused to perform their duties faithfully.

"(b) All witnesses before courts-martial shall be examined on oath or affirmation."

It is crystal clear that this section is limited to the actual trial stage of general and special court-martial cases. It is not unusual for counsel to appear in other proceedings without being sworn, for they participate in pretrial hearings and arguments before the boards of review and this Court, without being required to take an oath in each case. The language of the Article is clear and definite, we find no occasion to interpret the provision beyond its ordinary scope, and counsel have not advanced any sound reason why we should do so. Had Congress intended the requirement of being sworn to be applicable in other instances, it would have been a relatively easy matter to have so provided. We, therefore, find no merit in this assignment.

## IV

The next assertion of defense counsel finds root in their belief that the law officer must personally observe a witness in order to determine his competency to testify and that court members must see him to ascertain his credibility.

This contention does no more than protest the use of any deposition, for demeanor, understanding, responsiveness, appearance, evasiveness, and other mannerisms have some bearing, remote or otherwise, on the competency and reliability of all witnesses. Generally speaking, the usual indicia affecting those characteristics must, to some extent, be sacrificed when testimony is produced by depositions. However, because of the earnestness with which counsel present this issue, we feel disposed to answer their arguments. All civilian jurisdictions permit the production of some evidence by methods other than through the mouth of a witness who can be observed from the witness chair. Illustrations of this type of testimony are dying declarations, testimony given at former trials, official records, and entries made in the regular course of business, and these

items of evidence are everywhere admissible in criminal trials. Similarly, it is not unusual for a court or jury to determine the mental capacity of a person without the benefit of observing him testify. In a will contest case, the testator prepares the document for distributing his property, and, if his mental capacity is raised as an issue, his competency must be determined by means other than observation. We recognize that some of the illustrations apply only in civil cases, but if depositions are usable in criminal actions the principles do not change, and all we are pointing out is that the failure to, or impossibility of producing a person who is the source of the testimony is not fatal to the use of his evidence.

Indicative of the next arguments advanced by defense counsel is the quotation they use from United States v Slozes, 1 USCMA 47, 1 CMR 47, wherein we cited with approval this statement taken from Oliver v United States, 267 Fed 544 (CA4th Cir) (1920):

". . . In determining the competency, and intelligence of a witness, the court may and should take into consideration the general appearance and manner of the witness, as well as the statements made by him."

Other citations given by the accused are of similar purport, and they announce the law applicable when a witness is present in court and testifies, but the authorities are not in point if evidence is presented by the use of depositions. We can look to civilian courts for assistance in this area because, in cases involving civil actions, depositions can be used. The competency of witnesses is a relevant matter to be considered in those cases, and it can be established by the same methods as any other fact. A young boy's testimony may be taken by deposition, and the judge must rule on his competency without the benefit of having seen him. His presence may be of assistance, but it is not demanded. Any different rule in the military would deny the parties the use of depositions, and it would emasculate the provisions of the Code, as every deposition would be subject to attack on the grounds that the witness was

not present and his competency could not be ascertained. Dean Wigmore on Evidence, 3d ed, § 1408(9), supports this principle, as he states:

"*Insanity, or other Mental Incompetency.* A witness who has become *insane* is no longer qualified; his testimony in court is no longer available; and by universal concession his former testimony or deposition may therefore be used."

The only question we regard as important in this case is whether the law officer and the court were ▮▮▮▮▮ ▮ furnished with sufficient evidence to permit a fair determination of Hartz' mental incompetency in their respective fields of competency and credibility. It is argued that we should not reach that question, for the Government had the alternative of producing Captain Hartz, and, under the peculiar facts of his case, particularly in view of the critical importance of his testimony, his production at trial was demanded. We know of no such requirement, but assuming, arguendo, that it has merit, the record shows the futility of applying it in this instance. So far as we are able to ascertain, the witness had reverted to a state of insanity at the time of the trial, and had he been produced he probably could not have testified. The latest information shows him to be insane and we have no way of ascertaining whether he has had any temporary periods of sanity since that time. The time of trial should not be controlled by any such contingency.

Contrary to accused's assertion, we conclude a sufficient predicate was laid to permit the deposition to be received in evidence. There is no substantial dispute in the medical testimony, and the record conclusively establishes that at the time when the deposition was taken, the Captain was mentally competent to testify. The doctors who observed him during that period were of the opinion that he was in a period of remission, could recall the facts and circumstances surrounding his dealings with the accused, could relate them clearly, and understand the moral obligation of telling the truth. Captain Rosen, who treated him in the Far East,

recognized that he had a mental disease during which periods of remission could occur. It was his opinion that if Hartz was in that state at the time he was questioned, Rosen would accept his testimony as true. A reading of Hartz' deposition and his answers to the questions propounded indicate a capacity to remember and fully and clearly state the facts and circumstances surrounding the loan to the accused. Furthermore, the fact that he was mentally responsible during the period of that transaction can be found in the testimony of the other witnesses, including the accused, who were thrown in daily contact with him. It would be a bit unusual for the accused to seek the loan of $600.00 from an insane person, or leave him in a position of trust if he gave evidence of mental infirmity. Moreover, his immediate superior had no cause to be alarmed about the manner in which he performed his daily tasks, and the records of his financial transactions indicate his capacity to deal with money and figures. Therefore, a complete picture of the Captain's mental deterioration, his return to sanity prior to the taking of the deposition, and his subsequent relapse was painted for the court. Whether he was competent and whether he should be believed were issues which were properly framed by the testimony, and the rulings by the law officer and the finding of the Court are supported by the record. Accordingly, this contention of the accused must be overruled.

V

The last issue presents an asserted error growing out of the law officer's refusal to grant a continuance to the accused to cross-interrogate further the two medical witnesses who testified by deposition. The facts surrounding this issue are these: Certain cross-interrogatories were prepared and a few were predicated on the answers expected to be given to previous questions. The need for answering those interrogatories depended entirely upon the nature of the reply given to a previous question. If the basic question was answered in one manner the next interrogatory would require considera-

**345**

tion. If it were answered in the opposite manner, the following question would be inapplicable. In some instances the interrogatories were pyramided. We could select any question and answer to illustrate the point, but to pose fairly the issue, we quote from the ninth to the twelfth cross-interrogatory submitted to Dr. Grasberger, together with his answers:

"Ninth cross-interrogatory: If you have indicated in any of your previous answers that Captain Hartz is suffering from a mental ailment, is that ailment such as would cause him to withdraw from reality?

"Captain Hartz' illness at this hospital has not been characterized by seclusiveness or tendency to avoid communication with other people.

"Tenth cross-interrogatory: If your answer to the previous question is that Captain Hartz' mental illness is such that he does withdraw from reality, would he substitute delusions or hallucinations for reality?
"No answer required.

"Eleventh cross-interrogatory: If your answer is that he would be inclined to substitute delusions or hallucinations for reality, would such delusions or hallucinations form a part of his memory pattern to the extent that he could not distinguish reality from his hallucinations or delusions?
"No answer required.

"Twelfth cross-interrogatory: If your answer to the previous question is that Captain Hartz' delusions or hallucinations form a part of his mental pattern, would he, if subsequently pronounced cured or convalescent, be able during his lucid periods to correctly correlate and distinguish what had been his delusions and hallucinations as distinguished from reality?
"No answer required."

When the depositions were offered in evidence defense counsel made numerous objections, but the one relevant to this issue can be found in the two following statements:

"What we would like to do, if we are going to have to have it by deposition, we want to take another deposition from this witness and require him to answer our questions.

. . . . . . . .

"We again renew our objection to this whole thing on the ground that the witness did not answer the questions propounded by the defense, and therefore, we have been denied our right of cross-examination."

Defense counsel's argument can be separated into two parts: First, was the deposition inadmissible because of the refusal of the witnesses to answer the cross-interrogatories; and second, did the law officer err in refusing to grant a continuance for the purpose of permitting the accused to submit further interrogatories? In connection with the first issue, defense counsel call our attention to the rule announced in Wigmore, Evidence, 3d ed, § 1391, where that learned author states the principle in the following language:

"Where the witness, after his examination in chief on the stand, has *refused* to submit to cross-examination, the opportunity of thus probing and testing his statements has substantially failed, and his direct testimony should be struck out. On the circumstances of the case, the refusal or evasion of answers to one or more questions only need not lead to his result.

"When such a refusal, however, occurs in answer to the *written interrogatories* of a deposition (taken on the Chancery model), the situation may require more strictness, for the deponent is not in a position to be coerced by the court's summary process, and the opportunity of further probing the witness and of investigating the motive of the refusal and the materiality of the loss of evidence is not so abundant. . . ."

We concede the force of the rule announced above, but we do not believe it applicable in this instance. The authorities in civilian courts are to the effect that judges have considerable latitude in admitting or refusing to admit depositions where the right of cross-exam-

ination has been impaired. There is no doubt that where a witness refuses or declines to answer pertinent and material questions, regarding facts apparently within his knowledge, good grounds exist for excluding the deposition. On the other hand, recognition is given to the rule that when a witness fairly attempts to answer the question as he understands it, admission is not denied. In the instant case, the witnesses were not contumacious or evasive, and they did not refuse to make a full and fair disclosure of all matters as to which they were questioned. In those instances where the witness stated that no answer was required he or she based that reply on the fact that the information given on the previous cross-interrogatory rendered the question inapplicable. Certainly, the questions propounded in the cross-interrogatories would lead a witness to answer in the manner used by the doctors, but, in spite of that, the depositions, taken over-all, show a substantial development of the subject matter about which the doctors were called upon to testify.

The next part of the argument goes to the assumed error of the law officer in not permitting the submission of further interrogatories. It is a well-settled rule that a law officer has some discretion in ruling on a motion for a continuance. In this particular instance, the accused sought to delay the proceedings because of an asserted right to require answers to the cross-interrogatories propounded. However, the burden rests upon him to show good cause why a continuance should be granted. Once the trial of a case commences it should not be interrupted unless its continuation will work to the substantial prejudice of the accused. Here counsel for the accused sought a delay but his reasons were insufficient. Certainly no one would contend that an accused should be denied his right of cross-examination, and if it was apparent from this record that that privilege was denied, then the law officer erred. However, we must determine the ruling by the yardstick furnished by trial defense counsel. As stated above, the continuance was requested because of an assertion that the questions were not answered and that the accused should be granted a continuance so that an answer could be compelled. It is to be noted he does not assert that the witnesses gave answers which were not responsive to the questions or opened up areas which were not known at the time the interrogatories were prepared. Had the witnesses gone outside the script and departed from the subject of the question, the accused might have been denied his right of cross-examination, but no such event occurred. Stated in a light most favorable to him, all his counsel was contending for was an opportunity to require a witness to answer an interrogatory in a different manner. After studying the interrogatories, cross-interrogatories, and answers, and listening to the arguments of counsel, the law officer concluded that the accused had been furnished an opportunity to cross-examine and the witnesses had furnished answers where required. While development of a subject is permitted, the refusal to grant a continuance to obtain different variations in answers furnished by a deponent is not the denial of a substantial right. It is interesting to note that defense counsel does not contend that further examination would be likely to weaken the conclusions reached by the doctors, affect their credibility, or strengthen his case, and perhaps this could be expected, for his own expert's testimony corroborates the evidence found in the depositions. True it is that a subject cannot be explored as fully on written interrogatories as it can when the witness is personally present, nor can an answer be narrowed by an adroit rephrasing of questions. However, that is not the test. As we understand the principle involved, the accused must be afforded the right to cross-examine a witness within the scope of the direct examination. In the case of depositions, if the witness ventures into new areas which are material and relevant because of non-responsive answers, defense counsel should be afforded an opportunity to explore those fields. If, however, the issues are well identified, the witness confines himself to the controversy in-

347

volved, and cross-examination is conducted, no substantial right has been infringed, even though the answers are not what counsel would have preferred. In the case at bar, counsel for the accused was entirely familiar with the medical questions which were propounded, and he had the advantage of the findings of a psychiatrist prior to the time when the interrogatories were prepared. A reference to the testimony of the three medical witnesses will disclose that everyone connected with the case understood that Captain Hartz suffered a mental derangement on or about the time of his relief from assignment. The nature of the mental defect was known and the only question involved was whether the witness was insane at the time of the transaction or when his deposition was taken. Trial defense counsel was entirely familiar with the diagnosis made by Captain Rosen, for the clinical abstract prepared by him concerning Hartz was mentioned in the first cross-interrogatory. In addition, he appears as a witness at the pretrial hearing and was subjected to examination by defense counsel. From the picture gained there, counsel was placed on notice that Captain Hartz would not be competent to testify unless it was established that he had recovered or was in a period of remission. That was the only issue submitted to the two psychiatrists who testified by deposition, and a reasonable opportunity was afforded defense counsel to cross-examine in that area. Merely because the answers given by the witnesses did not satisfy counsel is not sufficient reason to grant a continuance. We, therefore, conclude that the law officer did not abuse his discretion when he overruled the motion for a continuance.

The decision of the board of review is affirmed.

Judge Ferguson concurs.

Quinn, Chief Judge (dissenting):

In my dissenting opinion in United States v Sutton, 3 USCMA 220, 11 CMR 220, I set out at length the ▆▆▆▆ ▆ reasons for my conclusion that the majority's interpretation of Article 49 of the Uniform Code of Military Justice, 50 USC § 624, deprives an accused in the military service of his Constitutional right to confront and cross-examine the witnesses against him. I need not completely reiterate them here. However, in view of the conflict in regard to the mental competency of the principal Government witness, I think it is appropriate to quote briefly from my opinion in the Sutton case.

"To satisfy the requirements of confrontation, at some stage in the proceedings against him, an accused must have an opportunity to cross-examine a witness by direct and personal questioning in the same manner as in court. Tested by this standard, the procedure used in obtaining the deposition in this case deprived the accused of his right of confrontation. I cannot regard the right to submit written cross-questions to an unseen and unheard witness as a satisfactory legal substitute.

. . . . . . .

"I do not read Article 49, Uniform Code of Military Justice, supra, as limiting the accused's right to cross-examination to the mere submission of written cross-questions to an absent witness. To me, it provides only, as did its predecessors, that a deposition may be taken by the Government, as well as by the accused. Such authority by itself in no way infringes upon the accused's right of confrontation. Wigmore, Evidence, 3d ed., § 1398, pages 136–140. However, giving the prosecution the right to take deposition testimony is one thing, but denying an accused a full opportunity of cross-examination is another.

"Almost half of the states in the United States have provision for the taking of deposition testimony at the request of the prosecution. However, it is extremely significant that, in the absence of accused's consent, all require an opportunity for the accused or his counsel to be present at the taking thereof. See Appendix A. Where the prosecution's deposition is to be taken at a distant place, the Government must pay the reasonable expenses of the accused or his counsel incident to attendance. Mo. Rules

Crim. Proc., Rule 25.13; Page's Ohio Gen. Code Anno., §§ 13444.13, 13444.-14; Wisc. Stat. (1951), § 32606. Only three states permit the prosecution to take the deposition of a distant witness on written cross-interrogatories. But, even in those states the prosecution may use such interrogatories, and limit the accused to cross-examination by cross-interrogatories, only if that method of procedure is first used by the accused. New York Code of Crim. Proc., § 645, et seq.; People v Werblow, 205 NYS 617, 123 Misc 204, affd 212 App Div 445, 209 NYS 588, rev'd on other grds., 241 NY 55, 148 NE 786; People v Parkinson, 187 Misc 328, 63 NYS2d 903; see also Ind Stat Anno (Burns), § 9-1610; Maine Rev Stat (1944), chap 135, § 23; 9 Anno L Mass § 277:77. The latter practice is, of course, justifiable as a waiver by the accused of the right of confrontation. Diaz v United States, 223 US 442, 56 L ed 500, 32 S Ct 250.

"This unbroken line of legislative recognition of the requirement of personal and direct questioning of a witness, to satisfy the right of confrontation, surely lends strength to the conclusion that Congress did not intend by Article 49, Uniform Code of Military Justice, supra, to abolish the requirement for an accused in the military service. The hearings before the House Subcommittee of the Committee on Armed Services considering the Uniform Code (H. R. 2498) reinforces that conclusion."

I would, therefore, set aside the findings of guilty of specification 1, Charge I, and specifications 1 and 3 of Charge III, and the sentence.