UNITED STATES, Appellee

v

LORETTA M. JACOBY, Airman Third Class,
U. S. Air Force, Appellant

11 USCMA 428, 29 CMR 244

*Major Quincey W. Tucker, Jr.*, argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel James L. Kilgore.*

*Major Lawrence J. Gross* argued the cause for Appellee, United States. With him on the brief were *Colonel John F. Hannigan* and *Major John C. Wiley.*

## Opinion of the Court

HOMER FERGUSON, Judge:

Tried by special court-martial, the petitioner was found guilty of several specifications involving the uttering of worthless checks, in violation of Uniform Code of Military Justice, Article 134, 10 USC § 934. She was sentenced to a bad-conduct discharge, forfeiture of $70.00 per month for four months, confinement as hard labor for four months, and reduction to the grade of basic airman. Intermediate appellate authorities affirmed, and we granted review on the issue whether it was proper to receive in evidence certain depositions taken upon written interrogatories over the accused's objection that she was thereby denied her constitutional right to be confronted by the witnesses against her.

Three bank officials were permitted to testify at accused's trial through the medium of written interrogatories. Their testimony identified certain prosecution exhibits as photostatic copies of checks which the accused had presented for payment at their establishments and related the subsequent return of these unpaid instruments.

Prior to the trial, accused's counsel was notified of the intent of the Government to secure from the witnesses concerned depositions upon written interrogatories. Objection was immediately made to the convening authority on the basis that the accused would thereby be denied her right to confrontation of the witnesses against her, and it was prayed either that the witnesses be produced at the trial or, in the alternative, that an opportunity for confrontation be afforded by the taking of oral depositions. The convening authority overruled defendant's objections and authorized the taking of depositions upon written interrogatories with the caveat that additional questions might be submitted "to clarify any points." Counsel submitted no written cross-interrogatories and unsuccessfully maintained the same objections at the accused's trial.

The Government argues before us that our decisions in United States v Sutton, 3 USCMA 220, 11 CMR 220, and United States v Parrish, 7 USCMA 337, 22 CMR 127, are dispositive of the granted issue. Appellate defense counsel, however, challenges our previous interpretation of Code, supra, Article 49, 10 USC § 849, on the ground that it causes the statute to conflict with the Sixth Amendment, United States Constitution. Our reexamination of the question convinces us that the accused's position is meritorious.

Code, supra, Article 49, provides:

"(a) At any time after charges have been signed as provided in section 830 of this title (article 30), any party may take oral or written depositions unless an authority competent to convene a court-martial for the trial of those charges forbids it for good cause. If a deposition is to be taken before charges are referred for trial, such an authority

**429**

may designate commissioned officers to represent the prosecution and the defense and may authorize those officers to take the deposition of any witness.

"(b) The party at whose instance a deposition is to be taken shall give to every other party reasonable written *notice of the time and place for taking the deposition.*

. . . . . . .

"(d) A duly authenticated deposition taken *upon reasonable notice* to the other parties, so far as otherwise admissible under the rules of evidence, may be read in evidence before any military court or commission in any case not capital, or in any proceeding before a court of inquiry or military board, . . ." [Emphasis supplied.]

In United States v Sutton, supra, the Court was faced with the same question now before us. A majority, for differing reasons, held that Code, supra, Article 49, might, without denying an accused "military due process," be properly interpreted as authorizing the taking of depositions upon written interrogatories without the presence of the accused or his counsel. Judge Latimer approached the problem historically and, admitting that the early Articles of War relating to the taking of depositions required the presence of the accused, expressed the view that subsequent legislation repealed the provision by implication. See Article of War 74, 2 Stat 368, as amended, 12 Stat 736; Article of War 91, Articles of War of 1874; Articles for the Government of the Navy, 1909, Article 68, 35 Stat 622. Each of these statutes, however, provided for reasonable notice to the affected parties, as does the present Article. He also pointed out that the right of confrontation was essentially one of cross-examination and that denial of the secondary advantage of physically facing one's accusers "is a penalty which Congress has said .. . . [the accused] must pay because of the limitations inherent in the military system." United States v Sutton, supra, at page 226. The late Judge Brosman concurred generally in

Judge Latimer's opinion but added a separate exposition of his belief that military use of depositions was an exception to the command of the Sixth Amendment. He did not seek, however, to construe the Constitution in light of the requirement, contemporaneous with its adoption, that an accused be present during the taking of interrogatories. Chief Judge Quinn dissented on the basis that the taking of depositions upon written interrogatories without the physical confrontation of the accused by the witness denied the former's right "to be confronted with the witnesses against him." Amendment VI, United States Constitution; United States v Sutton, supra, at page 231.

In United States v Parrish, supra, the author of the present opinion chose, out of respect to the former holdings of this Court, to adopt Judge Latimer's rationale in United States v Sutton, supra, and continue the interpretation of Code, supra, Article 49, there set forth. Critical re-examination of the problem in the light of the Constitution convinces me that we erred in so giving effect to the doctrine of *stare decisis*. While I have continually supported the application of that rule in military law, see my separate opinion in United States v Hickman, 10 USCMA 568, 28 CMR 134, it should never be applied in order to perpetuate a mistaken view. Candler v Rose, 80 F2d 407 (CA 5th Cir) (1935); Helvering v Hallock, 309 US 106, 60 S Ct 444, 84 L ed 604 (1940). Indeed, it is our duty to overrule and modify decisions which are erroneous, although there has been no legislative change in the law as originally construed. Cosentino v International Longshoremen's Ass'n, Etc., 126 F Supp 420 (D Puerto Rico) (1954). See, generally, 21 CJS, Courts, § 193.

While the dissenting Judge apparently disagrees, see United States v Sutton, supra, and United States v Clay, 1 USCMA 74, 1 CMR 74, it is apparent that the protections in the Bill of Rights, except those

which are expressly or by necessary implication inapplicable, are available to members of our armed forces. Burns v Wilson, 346 US 137, 73 S Ct 1045, 97 L ed 1508 (1953); Shapiro v United States, 107 Ct Cl 650, 69 F Supp 205 (1947); United States v Hiatt, 141 F 2d 664 (CA 3d Cir) (1944). Moreover, it is equally clear that the Sixth Amendment guarantees the accused the right personally to confront the witnesses against him. Mattox v United States, 156 US 237, 15 S Ct 337, 39 L ed 409 (1895); Reynolds v United States, 98 US 145, 25 L ed 244 (1879); Motes v United States, 178 US 458, 20 S Ct 993, 44 L ed 1150 (1900).

Mattox v United States, supra, involved the admission in the defendant's trial of the reporter's record of testimony by certain witnesses, since deceased, who had testified at a former hearing of the same case. In construing the Sixth Amendment, the Supreme Court stated at pages 242–244:

"*The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief. There is doubtless reason for saying that the accused should never lose the benefit of any of these safeguards even by the death of the witness; and that, if notes of his testimony are permitted to be read, he is deprived of the advantage of that personal presence of the witness before the jury which the law has designed for his protection. But general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations*

*of public policy and the necessities of the case.* To say that a criminal, after having once been convicted by the testimony of a certain witness, should go scot free simply because death has closed the mouth of that witness, would be carrying his constitutional protection to an unwarrantable extent. . . .

. . . . . . .

"*The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination. This, the law says, he shall under no circumstances be deprived of,* and many of the very cases which hold testimony such as this to be admissible also hold that not the substance of his testimony only, but the very words of the witness, shall be proven." [Emphasis supplied.]

In Motes v United States, supra, one of a number of co-defendants appeared as a Government witness in the preliminary hearing before a United States Commissioner. By the time of the trial, the witness had disappeared. It was not established that any of the defendants were responsible for the witness' absence from the trial. In finding that the trial court erred in receiving a stenographic record of the witness' testimony before the Commissioner, the Supreme Court again invoked the Sixth Amendment, although it clearly appeared there was either cross-examination by the other defendants or the opportunity for it. Mr. Justice Harlan, speaking for the Court, stated, at page 474:

". . . We are unwilling to hold it to be consistent with the constitutional requirement that an accused shall be confronted with the witnesses against him, to permit the deposition or statement of an absent witness taken at an examining trial to be read at the final trial, when it does not appear that the witness was absent by the suggestion, connivance, or procurement of the accused, *but does appear that his absence was due to the negligence of*

**431**

*the prosecution."* [Emphasis supplied.]

Dean Wigmore's view, however, supports to some extent our decision in United States v Sutton, supra. Thus, he urges that the principal requirement of confrontation is the opportunity to cross-examine and that the secondary advantage of the witness' presence is not a constitutional requirement. Wigmore, Evidence, 3d ed, §§ 1395–1397. Authority for his position is not found in the decided Federal cases, and, indeed, United States v Mattox, supra, and United States v Motes, supra, are contrary to his teachings. Other text writers seemingly adopt the position that the accused's presence, as well as the opportunity to cross-examine, must be shown. Wharton, Criminal Evidence, 12th ed, §§ 470, 472; Greenleaf, Evidence, 16th ed, page 16; Jones, The Law of Evidence, 5th ed, § 689. Wigmore, regardless of views on physical confrontation, insists that the right to cross-examination be fully preserved. This, he states, cannot be had *"except by the direct and personal putting of questions* and obtaining immediate answers." (Emphasis supplied.) Wigmore, supra, § 1395.

Common sense supports the Dean's view. Cross-examination necessarily depends as much upon the witness' *answers* to the questions put by the prosecution as it does upon the interrogatories. When the deposition is taken in the absence of counsel and the accused, cross-interrogatories must be framed on the basis of the prosecution's inquiries and the unsatisfactory substitute of letters or pretrial affidavits from the witness. Other than the dubious advantage of submitting additional cross-interrogatories, there is no way by which the defense counsel may accurately take advantage of the witness' direct replies and frame his questions to minimize the damaging effect of the Government's evidence. Moreover, in putting his cross-interrogatories blindly, counsel runs the risk of impaling his client upon defense-sought answers. In short, cross-examination is a two-edged sword and

432

he who would serve his client must be afforded the opportunity personally to question the witness if this great right is adequately to be preserved.

Bearing in mind the foregoing authorities, we turn to an examination of Congressional intent in enacting Code, supra, Article 49. When the question of the use of depositions on behalf of the prosecution was raised before the House Armed Services Committee, the following colloquy occurred:

"Mr. FINN. Well, as I understand the present Federal program, the accused or defendant can have depositions introduced in his behalf but the prosecution cannot. This as drawn, sir, is contrary to every concept of Anglo-Saxon and American justice as to the right of the person accused to the confrontation of the witness against him.

"Mr. ELSTON. Well, we have a law in the State of Ohio, for example, that permits the State to take depositions, *but means and opportunity must be afforded to the defendant and his counsel to be present at the taking of those depositions.*

"Mr. BROOKS. This is what we call depositions *be ne esse."* [Emphasis supplied.] [Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, pages 696, 697.]

While the comments of the Committee members concerning the construction to be put upon the Article are not entirely clear, they indicate to some extent a belief that accused's presence was required and offer a sufficient foundation for our conclusion that the statute demands the opportunity for confrontation of the accused and the witness at the taking of depositions. It is our duty to interpret an act of the Congress so that it accords with the Constitution if that construction is at all possible. Crowell v Benson, 285 US 22, 52 S Ct 285, 76 L ed 598 (1932); United States v Shaughnessy, 234 F 2d 715 (CA 2d Cir) (1955); Karseal

Corporation v Richfield Oil Corporation, 221 F 2d 358 (CA 9th Cir) (1955). Opportunity for the accused's presence with counsel at the taking of depositions substantially affords him the right of confrontation guaranteed by the Sixth Amendment. While Mattox v United States, supra, speaks of the witness' presence at the trial, i.e., face to face with the jury, it also recognizes that "general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case." Mattox v United States, supra, page 243; cf. Motes v United States, supra. That the exigencies of the military service frequently prohibit the appearance of a military witness or a civilian far removed from the place of trial is too well known to require documentation. Moreover, this was recognized by the Articles of War in effect before and immediately after the adoption of the Constitution. Hence, it was provided in Article 10, Articles of War, 1786, that depositions might be taken in cases not capital, "provided the prosecutor and person accused are present at the taking of the same." Similarly, Article 74, Articles of War, 1806, permitted the taking of depositions "provided the prosecutor and person accused are present at the taking of the same, or are duly notified thereof." See Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, pages 973, 983. The existence of such legislation at the time of the adoption of the Sixth Amendment is strong evidence that a military accused's right of confrontation is satified by the opportunity to be present at the taking of depositions. Indeed, it has been said that the contemporaneous legislative exposition of the Constitution by its framers fixes the construction of its provisions. Myers v United States, 272 US 52, 47 S Ct 21, 71 L ed 160 (1926).

The dissenting Judge suggests that this requirement was later eliminated by Congress from the statute. While the matter is unimportant in view of our belief that the earlier acts are more relevant in construing the intent of the drafters of the Constitution, it is distinctly arguable that requirement of the presence of the accused was continued by the legislative provision for reasonable notice to him of the time and place of the taking of the depositions. Surely, there is little reason to give notice concerning these facts, if depositions are to be taken upon written interrogatories, with the accused having no right beyond the submission of cross-interrogatories. These are prepared locally and unless it was intended that he be present, he would have no interest in when and where the questions would be put to the deponent. Be that as it may, the historical development of military practice and subsequent enactments of Congress have little bearing on the contemporaneous meaning of the Sixth Amendment.

We conclude, therefore, that the interpretation which we placed upon Code, supra, Article 49, in United States v Sutton and United States v Parrish, both supra, so lends itself to conflict with the Sixth Amendment that those cases should be overruled. The correct and constitutional construction of the Article in question requires that the accused be afforded the opportunity (although he may choose knowingly to waive it thereafter) to be present with his counsel at the taking of written depositions. We so hold.

The board of review is reversed and the record of trial is returned to The Judge Advocate General, United States Air Force. A rehearing may be ordered before another court-martial.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):
I dissent.

In United States v Sutton, 3 USCMA 220, 11 CMR 220, Judge Brosman made the following observation which is apropos in this instance:

"The Chief Judge has assumed the power to hold an act of Congress unconstitutional—at least in part. I

say he has 'assumed' this power, because he has not undertaken to demonstrate that we possess it. Perhaps he believes the existence of such authority in the judges of this Court to be so evident as to dispense with exposition. For my part, however, I do not believe the matter to be quite so clean-cut as he. In any event, I find no necessity to determine this delicate and difficult question here and now, for I perceive no fatal infirmity in the portion of the Uniform Code of Military Justice under attack here."

Here, as in that case, there is no need to dwell on the power of this Court to declare an act of Congress unconstitutional—even though it be arguable that by so doing we divest the Supreme Court of the United States of jurisdiction to be the final arbiter of the constitutionality of a Federal statute—because under well-established principles of law a majority of this Court has over a long period of time held the Article constitutional. Moreover, as I pointed out in my dissent in United States v Russo, 11 USCMA 352, 29 CMR 168, once this Court has interpreted a law and the services have operated under our construction, any change thereafter should be by legislation and not by judicial fiat. Congress can readily repeal the statute if we are in error, and the transition can be more orderly. Here we are confronted with a situation where the Article's provisions are exactly the same as when it was enacted in 1950, and it was held constitutional early in our history and again by the Court as presently constituted as late as August 31, 1956. United States v Parrish, 7 USCMA 337, 22 CMR 127. See also Judge Ferguson's separate opinion in United States v Brady, 8 USCMA 456, 24 CMR 266, decided December 13, 1957, where, in concurring, he added the following gratuitous comment:

". . . A convening authority may 'for good cause' forbid the taking of an oral deposition and provide instead that written interrogations be submitted. Article 49(a),

Uniform Code of Military Justice, 10 USC § 849."

Every argument made here and in the many cases we have refused to review has been answered by a majority of the Court in United States v Sutton, supra, and allied cases, and the Chief Judge has very vigorously and thoroughly presented his views in dissents. All aspects of constitutionality have been considered, and the rights of the parties fixed. There is no compelling reason to change, and there ought to be a time when the construction of a law becomes final, for vacillation tends to result in unequal application of the law. True it is that a bad decision should be corrected, but certainly if a majority of this Court erred, they did not err alone, for the framers of the Code— some of whom were eminently qualified lawyers—and all members of Congress believed Congress possessed the power to enact the Article, and their beliefs can be supported by good authority. To undercut the well-established construction and to reverse this conviction my brothers disregard many cardinal principles of constitutional law, and the about-face seems to be predicated in some measure upon the contentions that the terms of the statute are ambiguous and that we misconceived the intent of Congress in enacting the Article. I challenge those views for I find neither ambiguity nor uncertainty in the language of the Article or its legislative history, nor do I perceive any misconception of Congressional intent in any of the decided cases. Perusal of our opinions indicates that the original Court split only on the power of Congress to provide for taking, in the absence of the accused, testimony which could be used at the trial. Although, at this time, I can only speak for myself, I was of the opinion that the Court divided on the right of confrontation and not on the ambiguity of the Article.

Previously, I have said that the present opinion refuses to follow recognized and fundamental principles of constitutional law. I shall discuss some of the most important. First, a

court does not pass on the constitutionality of a law unless it is necessary to the determination upon the merits of the case under consideration. Here, at worst, even if we assume the Article invalid, we are only confronted with receipt in evidence of incompetent testimony. All the evidence that was furnished by the depositions was the testimony of certain bank officials that the accused had cashed checks at their institutions, and they had been returned unpaid. The accused, however, defended on the basis of mistake. She was a witness in her own behalf, and on the stand she judicially confessed to those facts shown by the depositions. In United States v Trojanowski, 5 USCMA 305, 17 CMR 305, we held that a judicial confession of guilt cured any possibility of claiming evidence was admitted in violation of Article 31, Uniform Code of Military Justive, 10 USC § 831. In United States v Hatchett, 2 USCMA 482, 9 CMR 112, we stated it would be ridiculous to reverse a case because evidence was placed in the record prior to the time the accused voluntarily and judicially confessed to the same set of facts. In the case at bar, it appears to me we are overturning the rule of those cases and not following other credible authorities when the findings and sentence are reversed on a constitutional basis even though the only evidence tainted is corroborated in all respects by the in-court testimony of the accused.

The next principle of statutory construction which is violated is that where there are two possible interpretations, by one of which the statute would be unconstitutional and by the other it would be valid, a court should adopt the construction which would uphold it. It seems to me that in the various cases touching on this subject, all Judges of this Court, with the exception of the Chief Judge, have previously found a valid basis for upholding the constitutionality of the Article. At this late date, it seems untimely to have Judge Ferguson reverse himself and hold that our prior decisions do not offer a defensible construction which would render the Article constitutional. In that connection, I echo the sentiments he expressed in United States v Hickman, 10 USCMA 568, 28 CMR 134. There he stated:

". . . The rule of *stare decisis* is peculiarly valuable in the administration of criminal law. Only by adherence to its basic principles will we be able to afford to those officers charged with duties in connection with the administration of military justice that guidance which they require in order to implement the mandates of Congress. Subtle and unsound distinctions such as those set forth herein lead only to confusion and warrant the criticism that we too frequently react as men rather than judges. I prefer the sounder approach of consistent disposition of appeals and certificates in accordance with previously recognized principles of law."

Another principle of construction which is given little, if any, consideration is that a court should be reluctant to declare an act unconstitutional which has been re-enacted by Congress for over a century of time when conditions peculiar to the services make it reasonable, it has been continuously operational, and it has never been held invalid by any court of record. In the history of this legislation which I set out in United States v Sutton, supra, I traced the enactment and re-enactment of the law from 1806 until the present. Defense Counsel challenges my historical construction and the Court seems to agree with the defense contention for the author of the principal opinion states that both before and after the adoption of the Constitution, the Articles of War provided that the prosecutor and person accused must be present at the taking of the deposition. The Article in effect in 1786, Article of War 10, provided, "On the trials of cases not capital, before courts-martial, the depositions of witnesses, not in the line or staff of the army, may be taken before some justice of the peace, and read in evidence, provided the prosecutor and person accused are present at the taking of the same." Apparently that provision was intended to reach civil-

435

ian witnesses who could not be ordered to appear before military courts at that time. So far as I can ascertain, that Article had its origin in the Statute of 23, William and Mary, which was made of force in 1712. That law authorized any justice before whom any prisoner was brought on certain charges to take his examination and the information of those who brought him in. While the testimony was usable at trial, it formed the basis of the charge, and obviously the defendant had to be present if he was to be examined. However, it is interesting to note that in 1786 there was a special reason why the presence of the accused was required, for Article of War 10 of that year must be considered in *pari materia* with Article of War 6, which provided:

"The judge advocate, or some person deputed by him, or by the general or officer commanding the army, detachment or garrison, shall prosecute in the name of the United States of America; but shall so far consider himself as counsel for the prisoner, after the said prisoner shall have made his plea, as to object to any leading question, to any of the witnesses, or any question to the prisoner, the answer to which might tend to criminate himself; and administer to each member the following oaths, which shall also be taken by all members of regimental and garrison courts-martial: . . ."

It ought to be apparent that Article of War 10, supra, as of that time was prescribing for the taking of oral testimony and, in the absence of the accused or his counsel the evidence would be furnished in the form of an *ex parte* affidavit, as the prosecutor represented the Government only, prior to plea. If the accused was present, he had himself for a lawyer and that afforded him to the right to cross-examine. Parenthetically I note that he was not too adversely affected, for in the early development of military law in this country counsel was not permitted to question witnesses. That was a privilege extended only to the accused.

436

The Ninth Congress, in 1806, changed the prior law for it eliminated the requirement that the accused be present and provided prior reasonable notice to him in the alternative. Article of War 74, enacted at that time, provided:

"On the trials of cases not capital, before courts-martial, the deposition of witnesses not in the line or staff of the army, may be taken before some justice of the peace, and read in evidence: provided, the prosecutor and the person accused are present at the taking the same, or are duly notified thereof." [2 Stat 368.]

In 1863, during the Civil War, the Thirty-Seventh Congress enacted the following provision, substituting notice for presence:

"*And be it further enacted,* That depositions of witnesses residing beyond the limits of the state, territory, or district in which military courts shall be ordered to sit, may be taken in cases not capital by either party, and read in evidence; provided the same shall be taken upon reasonable notice to the opposite party, and duly authenticated." [12 Stat 736.]

That provision was substantially repeated in the Articles of War of 1874. Article 91 thereof prescribed that:

"The depositions of witnesses residing beyond the limits of the State, Territory, or district in which any military court may be ordered to sit, if taken on reasonable notice to the opposite party and duly authenticated, may be read in evidence before such court in cases not capital."

That act probably was limited to the land forces, but in 1909 the Sixtieth Congress prescribed a similar mode of obtaining evidence in naval courts. That enactment provided:

"That the depositions of witnesses may be taken on reasonable notice to the opposite party, and when duly authenticated, may be put in evidence before naval courts, except in capital cases and cases where the punishment may be imprisonment or confinement for more than one year as follows: First, depositions of ci-

vilian witnesses residing outside the State, Territory, or District in which a naval court is ordered to sit; second, depositions of persons in the naval or military service stationed or residing outside the State, Territory, or District in which a naval court is ordered to sit, or who are under orders to go outside of such State, Territory, or District; third, where such naval court is convened on board a vessel of the United States, or at a naval station not within any State, Territory, or District of the United States, the depositions of witnesses may be taken and used as herein provided whenever such witnesses reside or are stationed at such a distance from the place where said naval court is ordered to sit, or are about to go to such a distance as, in the judgment of the convening authority, would render it impracticable to secure their personal attendance." [35 Stat 622–23.]

Accordingly, if at the time the Constitution was ratified the right of confrontation mentioned in the Sixth Amendment meant the witnesses must be present in court to testify, it did not mean this in military law. What was guaranteed in military law was the right of cross-examination, either in court or out of court. And since Article of War 74 of 1806, supra, there have been numerous Congressional enactments showing clearly that Congress intended to permit the Government to take evidence by depositions without the accused being present, provided he was afforded the privilege of cross-examination.

At this point, I believe it might be well to look to the construction placed on the statute by a recognized authority on military law. At page 147 of Colonel Winthrop's Abridgement of Military Law, published in 1887, I find the following comment:

"Under this Article, the deposition of a witness, military or civil, stationed or residing as specified, may be taken and admitted in evidence in any case except that of an offence made capitally punishable by the code. Thus a deposition would not be admissible in a case of a spy, of a deserter in time of war, or of a person charged with an offence in violation of Art. 21, 22, 23, 39, 41, 42, 43, 44, 45, 46, 56, or 57, or with one of the offences designated in Art. 58, when made capital by the local law.

"A 'reasonable notice' will be a notice of a few days,—generally from one day to three days,—such being a period ordinarily sufficient to enable the other party to note objections (if he has any,) to the direct interrogatories, prepare cross interrogatories, etc.

"Notice to take a deposition may be given before the arraignment and indeed before the court assembles. If practicable, depositions should be, and in general are, taken before the stage of the trial at which it is proposed to offer them in evidence, since otherwise the proceedings may be considerably delayed. Where, however, pending a trial, a deposition becomes necessary, the court is authorized by Art. 93, to grant a *continuance* till the depostion [sic] can be obtained.

. . . . . . .

"*Form of taking deposition.*—A deposition may be taken upon interrogatories independently framed by the judge advocate and accused respectively; *i.e.* upon separate sets of 'Direct Interrogatories,' 'Cross Interrogatories,' and sometimes of 'Re-direct Interrogatories.' A more expeditious and satisfactory form is that of a *deposition by stipulation,* where a single set of questions is agreed upon by the two parties as covering the case or the subject. A form for a deposition taken by stipulation is given in the Appendix. When the interrogatories have all been furnished or agreed upon, they are forwarded by the judge advocate to Department, etc., headquarters or to the War Department for the requisite action. The proper authority will designate an officer to meet the witness and take his deposition in the form of answers to the interrogatories."

**437**

Certainly, it ought to be obvious that as early as that date authorities familiar with military law were publicly stating that Congress had authorized the prosecution to obtain evidence in the absence of the accused. His privilege was to cross-examine by interrogatories and, even though it be a meager right, Congress concluded that in view of the peculiarities of the military service, it was a necessary compromise between conflicting interests. When consideration is given to that fact, together with the repeated re-enactments of Congress over a period of 152 years and the absence of any judicial holding that Congress was without power so to legislate, I find it difficult not to give considerable weight to the principle that we should be reluctant to hold the law invalid.

That brings up the principle that invalidity must be measured on scales which take into consideration the necessity for the law, to which I believe my brothers give little heed. I am of the opinion that the early enactments were compelled by the peculiarities of the military services and that necessity demanded some substitute form of taking testimony in military courts. In "A Treatise on Courts Martial," written by S. Payne Adye, and published in 1810, I find this view expressed at page 162:

"It is evident, from what has been said, how averse the courts of law are to the admission of depositions or other written papers, or hearsay, as evidence, when *viva voce* witnesses can be procured; and it behoves courts martial to be equally cautious; but their jurisdiction being limited to military persons, they have no authority to summon any others as witnesses; whereas, in a court of law, there is a process to bring them in, by writ of sub-poena; and from this want of power in courts martial, they are often obliged to give greater latitude to such sort of evidence; however, their credibility is left to the court."

In an opinion of the Attorney General, 9 Ops Atty Gen 311, March 22, 1859, I find the same condition to prevail:

"There is nothing in the laws of the United States authorizing and organizing courts-martial that gives them any power to enforce the attendance of witnesses who are not in the military service.

. . . . .

". . . Attendance before a court-martial is a duty of those engaged in military service, and their attendance may be compelled. But over *civil witnesses and persons not subject to military law,* power of compelling attendance to testify in a matter pending before a court-martial has not been vested either in the court-martial, or in any civil magistrate, judge, or tribunal. If such power has ever been exercised by any judge, it has been merely discretionery."

Without the authority to compel the attendance of civilian witnesses, military courts would have been severely crippled in administering military justice unless Congress could provide a way for both the Government and the accused to obtain the evidence required to present the true state of facts. Depositions and stipulations of fact were thereupon provided for because they offered the accused the right of cross-examination or the privilege of agreeing upon the testimony of the necessary witnesses.

The Supreme Court of the United States has recognized the rule of necessity. In Mattox v United States, 156 US 237, 243–244, 39 L ed 409, 15 S Ct 337, cited in the majority opinion, the Court stated:

"We are bound to interpret the Constitution in the light of the law as it existed at the time it was adopted, not as reaching out for new guaranties of the rights of the citizen, but as securing to every individual such as he already possessed as a British subject—such as his ancestors had inherited and defended since the days of Magna Charta. Many of its provisions in the nature of a bill of rights are

subject to exceptions, recognized long before the adoption of the Constitution, and not interfering at all with its spirit. Such exceptions were obviously intended to be respected. A technical adherence to the letter of a constitutional provision may occasionally be carried farther than is necessary to the just protection of the accused, and farther than the safety of the public will warrant. For instance, there could be nothing more directly contrary to the letter of the provision in question than the admission of dying declarations. They are rarely made in the presence of the accused; they are made without any opportunity for examination or cross-examination; nor is the witness brought face to face with the jury; yet from time immemorial they have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility. They are admitted not in conformity with any general rule regarding the admission of testimony, but as an *exception* to such rules, simply from the *necessities of the case,* and to prevent a manifest failure of justice." [Emphasis supplied.]

Judge Brosman, in his concurring opinion in United States v Sutton, supra, covered the same subject. There, referring to the foregoing quotation from Mattox, he stated:

"I need no clearer direction than this that an exception to the principle of confrontation may be compelled by necessity. I am sure that the other two members of this Court are as unwilling as Judge Quinn to 'disregard a constitutional [or, for that matter, any other] safeguard for reasons of *expediency*.' (Emphasis supplied). This is not to say, however, that we are not entirely willing in concededly critical areas, to weigh—thoughtfully and with a full sense of judicial responsibility—certain protections surrounding the individual against the practical demands of law administration in the military scene. In doing this we are supported both by ancient usage and the very highest authority. Indeed, the fabric of the common law is shot through with examples of this very process. That the safeguard with which we are concerned is enshrined in the Federal Constitution seems to have little to do with the case. Certainly any phrasing accorded it there must be the subject of interpretation. Moreover, the concept of confrontation was a tenet of the common law long before it became a constitutional principle. It has often yielded to the balanced claims of necessity in its earlier garb, and it should in a proper case—and has—in its later one as well."

Some argument can be advanced that while necessity existed at one time this reason no longer exists; and the reason having failed, the rule fails. Fundamentally, we are not deciding the wisdom of the act, for that is a prerogative belonging to Congress, but certainly there was and there is a necessity in the military service for the taking of both oral and written depositions. And I am certain that if members of Congress were convinced to the contrary, the present act would be repealed. Be that as it may, to support the doctrine of necessity, I need only refer to the conditions that existed when the Uniform Code of Military Justice was passed. United States servicemen were stationed around the globe, international relations were strained, and shortly thereafter—months before the Code became effective—war broke out in Korea and United States forces were fighting there. Many crimes were committed overseas where the armed forces had no legal process by which they could compel the attendance of foreign nationals. In addition, troops and individual soldiers were being moved rapidly from place to place, and they had no place which could be considered the district of their residence. For that reason alone, military courts were faced with an entirely different condition than were civilian courts and in many instances, before crimes were detected, the offenders were far removed from

**439**

the scene. I believe that the good name of the service and this country would be severely tarnished if crimes committed in foreign countries, or even in distant states, could not be punished, and Congress was faced with that possibility. It had to weigh certain protections surrounding the servicemen against the practical demands of law enforcement in the service and it concluded depositions were a necessity. That conclusion is clearly supportable, and this Court ought so to find.

Lastly, I touch on my brothers' concept that Congress intended to have the accused present at the time the interrogatories are reduced to writing. I would much rather have the Court reject the entire Article than to hack it into two pieces by such a strained and impractical interpretation. The Article states that depositions may be taken by either party upon oral or written interrogatories. There is no ambiguity in its wording and no uncertainty about its terms. In fact, I am more than mildly surprised that anyone would attempt to read confusion or ambiguity into the statute. Rather, I believe that everyone familiar with law understands the phrase "written interrogatories" and, as I have shown above, as early as 1806 the law only required reasonable notice to the accused. In 1887, Colonel Winthrop outlined the procedure and explained that questions were prepared by the side desiring the evidence, they were furnished the other party who prepared his cross-interrogatories and, when the prosecutor and the accused agreed upon the interrogatories, they were forwarded to higher headquarters for necessary action. From that time until today, the procedure has been substantially the same. Counsel need be put on notice that testimony is to be preserved, but what sense or logic would there be in having the accused prepare cross-interrogatories if he was going to be present at the time the evidence was recorded? That would be taking the evidence orally, for which the statute makes separate provision. Moreover, military courts may now subpoena witnesses, so why

would anyone in Congress expect the Government to transport an accused under guard and with his attorney to distant points within this country when the witness could be produced before the court-martial? That would be taking the mountain to Mohammed. Moreover, would anyone expect reasonably that Congress was saddling the service with the duty of transporting the accused with necessary guards and his counsel to overseas stations to observe a deponent write answers to questions which may be only preliminary to the real issue? A construction such as that strikes out of the Article the phrase "written depositions" and that is judicial legislation, not judicial interpretation. This type of case furnishes a good vehicle to illustrate what I mean to say. Members of the armed services cash checks all across the country and in foreign jurisdictions. Unfortunately, all too many of them turn out to be worthless, and the Government cannot within reason transport the writer to all points where he or she offends and to other places where the necessary witnesses may be located and, of course, the greater the number of offenses the greater the transportation burden. Other cases of a more serious nature pose the same difficulties. Even in peacetime, the obstacle created by this opinion may be unsurmountable, but go one step further and consider the problem when an emergency exists. Under those conditions, either enlisted men or officers are going to be taken away temporarily from critical duties and many servicemen used to guard traveling suspects, else prosecution must await the restoration of normal periods of peace. It should be readily apparent that those are all undesirable consequences of a change in the Article, and it is no answer to say that maybe emergency conditions might change the relative rights, for one of the important cornerstones of the Code was that it would work as written, in peace or in war.

The makeweight argument to the effect that when Congress provided for notice of the time and place of taking a deposition it indicated an intent to

have the accused present has no validity. That provision is most easily reconciled with the clear prescription for the taking of both oral and written interrogatories. In the event of the former, counsel for the parties must know when and where to appear. And in the case of the latter, notice is necessary to apprise the other side that evidence is being obtained by deposition, to fix a time certain for the appearance of a witness, to allow each party a voice in the time reasonably required to prepare their respective questions, to give the opponent an opportunity to object to the convening authority, and to bring certainty into what would otherwise be a haphazardous collection of evidence unknown to the opponent. It is to be remembered that both parties are entitled to take depositions and the requirement for notice is a protective provision to prevent *ex parte* proceedings.

It occurs to me that in this instance, not unlike some others, my associates warp the Code to make military law on all fours with civilian law. It is impossible to take the military out of military law, and I take the view that there is a fundamental distinction between the two and recognition ought to be given by this Court to the differences. The framers of the Constitution realized the country was faced with two separate and distinct systems of criminal law, for in the Constitution Congress was given the power to make rules for the government and regulation of the land and naval forces. That provision would have been unnecessary if the framers had not believed civilian criminal law could not be applied effectively to the members of the Army and Navy. Articles of War and those for the Government of the Navy have always been set apart from other criminal statutes, the Executive Department has always recognized the dissimilarity, and the Supreme Court of the United States has repeatedly emphasized the necessity for, and the wisdom of, having separate codes. Moreover, the recent civilian jurisdiction cases, which are the latest expression of that Court, show a recognition that discipline and command are still factors to be considered by military tribunals. In addition, that Court has always taken the position that the differences are of such importance that it has played no part in the development of military law. In Burns v Wilson, 346 US 137, 73 S Ct 1045, 97 L ed 1508, I find this significant comment:

> "Military law, like state law, is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment. This Court has played no role in its development; we have exerted no supervisory power over the courts which enforce it; the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment. The Framers expressly entrusted that task to Congress."

If the framers of the Constitution entrusted to Congress the task of striking a precise balance between the rights of men in the service and the overriding demands of discipline and duty, then I believe we must not reject the expressions of Congress merely because we believe the civilian system offers a better scale. Pursuant to that Constitutional grant of power, Congress has from time to time enacted legislation for the sole and only purpose of governing the service and, while some of the statutes have brought the two systems closer together, there is a gap which can never be closed unless the armed forces become a thing of the past. I contend that Article 36 of the Uniform Code of Military Justice, 10 USC § 836, most assuredly does not indicate a Congressional intent to mold the two into a common pattern. A like provision has been part of military law since at least 1917, but invariably the applicable Article of War has limited any similarity to procedures and modes of proof, and that area is circumscribed by the proscription that any rule must not be inconsistent with the Code. That does not make the laws similar, and perhaps the best straw in the

**441**

wind that Congress wanted dissimilarity perpetuated is found in Article 67 of the Code, 10 USC § 867. That brought this Court and a special appellate procedure into existence, and from this alone I infer that Congress must have believed there was a fundamental difference and that a court separate from the civilian judiciary was necessary to administer a specialized field of criminal law. Otherwise, it would have merely enlarged the jurisdiction of the civilian courts. Accordingly, I believe the Court should recognize that we are faced with issues which must be measured with regard to the necessities of the services and that a yardstick of civilian standards will lead us to false conclusions. Unfortunately, however, in this decision the Court turns up with a rod which fits neither. The long-established military rule is emasculated and the civilian rule is not reached. Rule 26 of the Federal Rules of Criminal Procedure provides that in all trials the testimony of witness shall be taken orally in open court unless otherwise provided by an act of Congress or the court rules. Congress has not authorized depositions by the Government in criminal cases in those courts, and Rule 15 permits the taking of depositions only on motion of the defendants. Accordingly, all the Court accomplishes by this decision is to suggest an incomprehensible means of obtaining evidence which is disowned under civilian rules and which is ill-fitted for use in military law. Therefore, it appears to me that if the law is to be rewritten, the Court should break cleanly with the past. Either Congress has the power to authorize the taking of depositions on written and cross-interrogatories or it does not. If the authority does not exist, it cannot be created by this Court judicially by inserting a provision in the statute that the accused must accompany the interrogatories. Perhaps overlooked by my associates in that connection is another constitutional privilege superimposed on confrontation, and that is the right to counsel. Either a certified defense counsel must be transported with the accused or he may be represented by a variety of lawyers who are ill-informed on what the real issues may be. But in either event the testimony is taken out of court and the court-martial is denied the benefit of personal observation. Considered in that light, the right is reduced to the privilege of cross-examination.

In making my presentation, I have not ignored the cloak of protection which should be accorded an accused. Congress did not leave him without relief, for he can make a showing before the convening authority that the taking of depositions might make it impossible for him to defend properly. Depositions are quite often used to prove preliminary or *pro forma* matters, and in those instances the burden placed on an accused is minimal, but sometimes more critical issues are involved and the production of live witnesses might be an indispensable requisite to determine the truth. If a proper showing was made by the accused that because the complexities of the issues made it impossible reasonably to develop evidence favorable to him by cross-interrogatories and the convening authority ordered the deposition over his objection, a question of abuse of discretion might become a justiciable issue. Such a question, however, is not raised by a record in which the interrogatories established merely that checks cashed for the accused were returned dishonored— facts which she judicially conceded while testifying in her own behalf.

For the foregoing reasons, I would affirm the decision of the board of review.