UNITED STATES, Appellee

v

ALVIN L. GLADWIN, Private, U. S. Army, Appellant

14 USCMA 428, 34 CMR 208

Captain John R. Nowell argued the cause for Appellant, Accused. With him on the brief were Colonel Joseph L. Chalk and Captain Charles W. Schiesser.

First Lieutenant Mervyn Hamburg argued the cause for Appellee, United States. With him on the brief was Lieutenant Colonel Francis M. Cooper.

## Opinion of the Court

FERGUSON, Judge:

Arraigned and tried before a general court-martial convened at Frankfurt am Main, Germany, by the Commanding General, V Corps, United States Army, the accused was found guilty of wrongful sale of Government property, larceny, making and uttering worthless checks, and housebreaking, in violation, respectively, of Uniform Code of Military Justice, Articles 108, 121, 123a, and 130, 10 USC §§ 908, 921, 923a, and 930. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for four years, and reduction. The convening authority approved the penalty. The board of review, reducing the adjudged confinement to a term of eighteen months, affirmed. We granted accused's petition for review upon the following issues:

"THE LAW OFFICER COMMITTED PREJUDICIAL ERROR AS A MATTER OF LAW IN ADMITTING INTO EVIDENCE AFFIDAVITS OFFERED BY THE GOVERNMENT (PROSECUTION EXHIBITS 23 AND 24).

"Whether Exhibits 23 and 24 were admissible under the provisions of Executive Order 11009, assuming the validity of the said Order."

The questions we consider concern themselves solely with the worthless check offenses alleged under Charge V and its specifications.

According to the Government's case, accused, on the various dates alleged, cashed ten checks drawn on the Lynnwood Branch, First National Bank of Everett, Lynnwood, Washington, at European offices of the American Express Company. These checks were forwarded through usual commercial channels and returned with markings of "unable to locate" or "account closed." Although the "drawer is . . . always contacted immediately to make a reimbursement," the checks remained unpaid at the time of trial.

A properly obtained pretrial statement of the accused was introduced, in which Gladwin declared his inability to explain the return of his checks, for, during the period September 5–10, 1962, he had an open account with the Lynnwood Branch, First National Bank, and had forwarded by mail to it $300.00 in cash for deposit.

Testifying in his own behalf, accused declared that he had opened his account at the Lynnwood Branch in June 1961, with a $50.00 deposit. He wrote checks on the account but made no further deposits. The bank had never notified him that the account was closed, but he believed it to be "slightly over-

**429**

drawn." During the first week of September 1962, he sent a deposit of $350.00 in cash by unregistered air mail. The bank finally acknowledged its receipt on December 17, 1962, after he had been confined and charges preferred. He told the agent who took his pretrial statement that he had so deposited $350.00, and the statement's reference to the amount as $300.00 was simply a discrepancy which he had overlooked in signing it.

He was first notified by American Express of the checks' dishonor on October 31, 1962, and intended to have them forwarded again for payment. However, he was confined the following day and did not have the opportunity to do so.

Also introduced in evidence was a letter from the bank dated December 19, 1962, acknowledging receipt of $350.00 on December 17, 1962, and informing him that, as it was unable to locate his account, the money would be held pending further instructions. Other witnesses testified that accused had been confined since November 1, 1962, and had not been outside the stockade except in the custody of guards. Prisoners were not allowed to send or receive funds while in the stockade unless the transaction was recorded. Stockade records revealed no dispatch of $350.00 by the accused, although they reflected receipt of that amount by him "from the United States" on January 10, 1963.

In addition to testimony identifying the checks and denoting the circumstances of their utterance and return, the Government offered the two exhibits in question here "both being Affidavits, under the provisions of the new promulgation in connection with paragraph 123a, Executive Order 11009." Over defense objection that their receipt violated the accused's right of confrontation under the Sixth Amendment, United States Constitution, they were, with the deletion of certain recitals, duly admitted in evidence.

Prosecution Exhibit 23, as received, states the following:

**430**

*"AFFIDAVIT*

"State of Washington }SS
"County of Snohomish }

"The Lynnwood Branch of the Seattle-First National Bank located at Lynnwood, Washington, is a business engaged in public banking activities. I am and have been employed by this bank as the Assistant Manager and am in charge of the business entries made concerning the account of Alvin L. Gladwin, which was opened on or about 23 June 1961 with a deposit of $50.00 as an individual checking account. On 17 November 1961 the First National Bank of Everett, Washington, along with its branches, merged with the Seattle-First National Bank of Seattle, Washington. On that date this bank became the Lynnwood Branch of the Seattle-First National Bank. The records maintained under our former name and ownership are now in our possession and a part of our business activity.

"I identify the attached Exhibits 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25, as photostatic copies of the original checks which were written on this account and returned unpaid by the bank for lack of sufficient funds in the account (account closed). I identify the 'return slips' attached to Exhibits 16, 17, 18, 19, 20, 21, and 25 as entries made in the regular course of business in the bank. In addition, business entries made in the records of this bank also show that each of the checks was returned unpaid to the maker thereof for lack of sufficient funds (account closed).

"Each return slip as well as all entries made in our records concerning these unpaid checks was made in the regular course of our public banking business, and it was the regular course of our banking business to make these entries.

"A diligent search of our banking records establish that after the initial deposit of $50.00 to this account on

or about 23 June 1961 no further deposits were made to the account.

(Signed) H. J. Johnson

H. J. Johnson
Assistant Manager

"SUBSCRIBED and SWORN TO before me this 1st day of February, 1963, at Lynnwood, Washington. [SEAL]

(Signed) Ben S. Lockster

Notary Public"

Prosecution Exhibit 24 declares:

*"AFFIDAVIT*

"State of Washington }
"County of Snohomish } SS

"The Lynnwood Branch of the Seattle-First National Bank located at Lynnwood, Washington, is a business engaged in public banking activities. I am and have been employed by this bank as the Assistant Manager and am in charge of the business entries made concerning the account of Alvin L. Gladwin, which was opened on or about 23 June 1961 with a deposit of $50.00 as an individual checking account. On November 17, 1961, the First National Bank of Everett, Washington, along with its branches, merged with the Seattle-First National Bank of Seattle, Washington. On that date this bank became the Lynnwood Branch of the Seattle-First National Bank. The records maintained under our former name and ownership are now in our possession and a part of our business activity.

"The attached statement is a true copy of the last bank statement made on the account of Alvin L. Gladwin, which was opened on or about 23 June 1961. This bank statement, a copy of which is attached, was prepared in the regular course of the public banking business of this bank and it was the regular course of the business of this bank to prepare these statements.

(Signed) H. J. Johnson

H. J. Johnson
Assistant Manager

"SUBSCRIBED and SWORN TO before me this 1st day of February, 1963, at Lynnwood, Washington [SEAL]

(Signed) Ben S. Lockster

Notary Public"

As noted in Mr. Johnson's statements, photostatic copies of the checks in question were annexed to Prosecution Exhibit 23 and a copy of the accused's account record was attached to Prosecution Exhibit 24.

I

Following the enactment of Code, supra, Article 123a, the President of the United States, acting pursuant to the authority conferred upon him by Code, supra, Article 36, 10 USC § 836, promulgated new rules of evidence concerned with the admissibility of regular entries in banking records. Executive Order 11009, March 16, 1962, 27 Fed Reg 2585. These were published as amendments and changes to the Manual for Courts-Martial, United States, 1951, paragraphs 143a(2), 143b, and 144c,[1] as sent out in the margin. Ad-

[1] "143a(2) *Exceptions.*

"3. Paragraph 143a(2) is amended by adding the following at the end thereof:

"In the case of a business entry which is that of any business regularly but not necessarily exclusively engaged in public banking activities and which relates to such public banking activities, a duly authenticated (143b(3)) copy is admissible to the extent that the original would be (see 144c), without first proving that the original has been lost or destroyed and without otherwise accounting for the original. If the banking entry is written or printed in a spoken language, only an exact (true) copy is admissible under this exception to the best evidence rule, although it may consist merely of an extract of those portions material to the case. The copy may be made by photographic or other duplicating process. If the banking entry is a machine or electronic entry, the copy or extract copy may consist of an accurate written 'translation' of such entry, whether made by machine or an 'interpreter'.

"It may be shown that certain business entries (144c) contain no record or entry of a purported act, transaction, occurrence, or event by the testimony of

dendum to Manual for Courts-Martial, United States, 1951. January 1963. Subject to the qualification that they must be consistent with the Uniform Code and United States Constitution, the publication of such new rules are within the Executive's competence. United States v Smith, 13 USCMA 105, 32 CMR 105. As we there noted, Article 36

---

the person in charge of the business entries in question, by the testimony of his assistant, or by the testimony of any person who has made a search of such business entries and is competent to understand them. Also, in the case of business entries of any business regularly but not necessarily exclusively engaged in public banking activities, it may be shown that certain business entries relating to such banking activities contain no record or entry of a purported act, transaction, occurrence, or event by a duly authenticated (143*b* (3)) certificate or statement signed by the person in charge of the business entries in question, or by his assistant, that after diligent search no record or entry of the specified tenor has been found to exist in such business entries. If a purported act, transaction, occurrence, or event is of a kind which in the regular course of business would have been made the subject of an entry in certain business entries of a particular business, proof that these business entries contain no entry concerning such act, transaction, occurrence, or event may be received as evidence that the act, transaction, occurrence, or event did not take place.

• • • • • •

"143*b*. **Authentication of writings.**
"4. Paragraph 143*b* is amended by adding the following at the end thereof:

"(3) *Authentication of banking entries.*—A business entry, or copy thereof, which is that of any business regularly but not necessarily exclusively engaged in public banking activities and which relates to such public banking activities may be authenticated in the same manner as other business entries (see 144*c*) or by a certificate or statement, signed under oath before a notary public by the person in charge of the business entry or his assistant, indicating that the writing in question is the original business entry or a true copy thereof (or an accurate 'translation' of a machine or electronic entry), as the case may be, that the entry was made in the regular course of banking business and that it was the regular course of the business to make the entry, and that the signer is the person in charge of the business entry or his assistant,

accompanied by a signed statement by the notary of his administration of the oath, under the seal of his office. A certificate or statement by a person in charge of such banking entries, or by his assistant, that after diligent search no record or entry of a specified tenor has been found to exist in such entries (see 143*a*(2)) may also be authenticated by subscribing the same under oath before a notary public, provided the certificate or statement is accompanied by a signed statement by the notary of his administration of the oath, under the seal of his office.

• • • • •

"144*c*. **Business entries.**
"5. Paragraph 144*c* is amended by inserting the following after the second sentence of the second paragraph thereof:

"Thus, if the holder of a check, draft, or other order for the payment of money upon a bank or other depository, or a person or organization acting on behalf of the holder, presents the instrument through regular banking channels for payment, collection, or deposit and the instrument is returned to the holder or his agent purportedly through regular banking channels with a notation in the form of a stamp, ticket, or other writing either on the instrument itself or accompanying it, purportedly made by the drawee or presenting bank or other depository or clearinghouse, indicating that payment of the instrument has been refused by the drawee because of insufficient funds of the maker or drawer in the drawee's possession or control or for other reasons, proof of the above facts will support an inference of the authenticity of the notation as having been made in the regular course of banking business by a business whose regular course it was to make the notation. The notation, if thus authenticated, is admissible under the business entry exception to the hearsay rule as evidence that payment of the instrument was refused by the drawee for the reasons indicated in the notation, and this is so whether or not a similar notation also made as a memorandum or record was kept in the drawee or presenting bank or other depository or clearinghouse. See also

432

"is a valid delegation to the President of the power, by regulations, to prescribe the modes of proof before courts-martial . . . [having] the force of law and . . . entitled to consideration by this Court, as by all others, in that light."

The accused, apparently recognizing the scope of Presidential authority in this area, confines his attack upon the new rules to their constitutionality, asserting that introduction of business entries into evidence without an opportunity to cross-examine their custodian, denies him the right of confrontation. Indeed, he contends that such procedure is far worse than the use of depositions taken upon written interrogatories which was condemned in United States v Jacoby, 11 USCMA 428, 29 CMR 244. There, at least, says the accused, he was permitted to ask some questions, even if he never saw the witness. Here, he can do neither. Thus, by a parity of reasoning, he concludes that authentication of business entries by a certificate of their custodian is a serious violation of the Sixth Amendment.

The argument has no validity here, for it is clear that there are many exceptions to the right of confrontation which deny the accused an opportunity to cross-examine without doing violence to his constitutional rights. For example, as we noted in *Jacoby*, supra, use of former testimony concededly does not violate the Sixth Amendment. Nor does admission of dying declarations. Robertson v Baldwin, 165 US 275, 41 L ed 715, 17 S Ct 326 (1897), or the use of official records received upon the certification of an appropriate clerk contravene its command. Dowdell v United States, 221 US 325, 55 L ed 753, 31 S Ct 590 (1911). In short, as the Supreme Court declared in Mattox v United States, 156 US 237, 39 L ed 409, 15 S Ct 337 (1895), at page 243:

". . . But general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case."

And, again, in Dowdell v United States, supra, at page 330:

"But this general rule of law embodied in the Constitution . . . has always had certain well-recognized exceptions. As examples are cases where the notes of testimony of deceased witness . . . have been admitted. Dying declarations . . . are uniformly recognized as competent testimony, . . . Documentary evidence to establish collateral facts admissible under the common law, may be admitted in evidence. Cooley, Constitutional Limitations, 2d ed, 450 note; People v Jones, 24 Michigan 224."

See also the cases collected in Wigmore, Evidence, 3d ed, § 1398.

As the Government points out, the new rules with which we are here involved provide for the admissibility of certified copies of bank records upon the sworn declaration by the appropriate bank official that he is the custodian of the records involved and that they are kept in the regular course of the bank's business and it is the regular course of its business to make such entries. It is only the authentication which the accused attacks as denying him the right to confront the custodian as a witness, and it is only that issue with which we presently deal. It is well settled that use of the entries themselves do not deny confrontation, for they are documentary evidence, and have been received in one form or the other from times antedating the Constitution. Wigmore, supra, § 1518. And, in United States v Leathers, 135 F2d 507 (CA2d Cir) (1943), Judge Augustus Hand, speaking for the Circuit Court of Appeals, expressly rejected the contention that use of regular bank entries denied a defendant his right of confrontation. He declared, at page 511:

". . . But statements by relatives as to pedigree, declarations against interest, and most important of all in criminal trials, dying declarations, have long been recognized as admissi-

---

143*b*(3) regarding the authentication of banking entries." [Addendum to the

Manual for Courts-Martial, United States, 1951, January 1963.]

ble. It is not necessary to say what limits the Sixth Amendment may set to the extension of exceptions to the rule against hearsay. Probably the permissible extension is a question of degree. We think that business records kept as a matter of ordinary routine are often likely to be more reliable than dying declarations. It cannot be reasonably argued that the extension of the common law book entry rule . . . involve[s] any violation of the Sixth Amendment."

So also do we agree that broadening the rule to permit authentication of regular entries in bank █ records is "but a slight extension of the rule of the common law, even as contended for by counsel." West v Louisiana, 194 US 258, 263, 48 L ed 965, 24 S Ct 650, 652 (1904); Gile v Hudnutt, 279 Mich 358, 272 NW 706 (1937). Admittedly, a criminal defendant is denied no constitutional right by the use of business entries against him and his consequent inability to cross-examine the entrant or contributors to the record. United States v Leathers, supra. And the extension of the rule here only applies to bank records the type of authentication familiarly upheld in the case of official records. Heike v United States, 192 Fed 83 (CA2d Cir) (1911). The Sixth Amendment did not freeze the rules of evidence as of the time of its adoption. Rather, it was "intended to prevent the trial of criminal cases upon affidavits, not . . . as a rigid and inflexible barrier against the orderly development of reasonable and necessary exceptions to the hearsay rule." Kay v United States, 255 F2d 476, 480 (CA 4th Cir) (1958), cert den 358 US 825, 3 L ed 2d 65, 79 S Ct 42 (1958). One may admit that bank records are not always reliable, but having the custodian present to identify them will not aid accused in this area. The custodian can only declare whether the records were duly maintained under his control. Only in rare instances would he be able to assist the court in determining their accuracy. Yet, the accused does not, as he cannot, complain of the use of records as such but seems to argue the custodian's presence would be a device

whereby doubt might be cast on the entries themselves. Cf. 28 USC § 1732.

The new rules are not a startling departure from practice elsewhere. Many jurisdictions have embodied such a principle in their statutes. Merkel v State, 167 Wis 512, 167 NW 802 (1918); Wisconsin Statutes, 1937, § 328.24 (bank books certifiable by custodian) and other statutes collected in Wigmore, supra, § 1683. Indeed, at least one jurisdiction permits conviction of issuing fictitious checks upon proof of dishonor by a notary's certificate of protest. People v Hollander, 163 Cal App 2d 379, 329 P2d 740 (1958); but see State v Reidel, 26 Iowa 430, 436 (1868). Considering these precedents and the other matters set forth above, we conclude that no constitutional standard was violated by the Presidential promulgation of evidentiary principles relating to proof of regular entries by means of a custodian's certificate.

We hasten to add, however, the obvious truth that such certification merely renders records admissible in evidence. It, of course, does not foreclose the right of the accused in a proper case to seek the attendance of the custodian as a witness or to obtain his oral deposition. Cf. United States v Jacoby, supra; United States v Thornton, 8 USCMA 446, 24 CMR 256.

## II

Much of what has been said above applies to the second question before us. Under the cited Manual provisions, it is obvious that the "affidavits" in question go far beyond the mere authentication of banking records or the certification of no entry being found in the facility's books regarding the accused. Indeed, the Government tacitly concedes that their contents are to a great extent inadmissible. And the law officer at the trial expressed substantial doubt concerning the matter, inviting the defense counsel to expunge that material which he thought objectionable. Counsel had no disagreement with receiving the recital of the bank's merger or to other portions setting forth statements of fact by the deponent, other than those stricken by the

434

law officer and his originally stated proposition that use of the process of certification by custodians denied the accused confrontation.

We join with appellate counsel in holding a great deal of the affidavits █ to constitute inadmissible hearsay and treat it as completely incompetent evidence. Indeed, we find nothing properly includable here beyond the certification of the business entries themselves or the absence thereof. Certainly, the merger details, identification of photostatic copies of the checks forwarded the bank by the Government, and various other factual statements find no sanction in the Manual's provisions. We deplore the fact that this case should evidence such an elementary disregard for the carefully limited principles set forth in Executive Order 11009, supra, and for the undoubted right of the defendant not to be tried upon *ex parte* statements. United States v Jacoby, supra; Mattox v United States, supra. We trust that future prosecutors will read the newly prescribed rules with more care and seek to utilize them only for the purpose intended rather than as vehicles for literally cramming in evidence everything but the kitchen sink.

But all this is not to say that there was prejudice to the substantial rights of the accused. Code, supra, Article 59, 10 USC § 859. Other competent evidence established the checks' negotiation and return. Accused conceded as much and testified that he, after receiving notice of their dishonor, intended to have them again forwarded for payment. He realized his account had been "slightly overdrawn," and, in defense, he relied solely upon a cash deposit of $350.00 to sustain his position that he wrote the checks in the honest belief that there would be sufficient funds to meet their payment upon presentment. This issue was properly submitted and resolved against him. Under these circumstances, we can find no prejudice flowing from use of the inadmissible portions of the exhibits in question. Again, however, we caution counsel from attempting to expand certification of business entries beyond appropriate limits.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge KILDAY concur.